J-A16034-14

2014 PA Super 285

K.A.R. FORMERLY K.A.L.

                Appellant

                v.

T.G.L.

                Appellee

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 1561 WDA 2013

Appeal from the Order September 6, 2013
In the Court of Common Pleas of Allegheny  County
Family Court at No(s): FD 00-7928-016

BEFORE:  DONOHUE, J., OTT, J., and MUSMANNO, J.

OPINION BY OTT, J.: **FILED DECEMBER 23, 2014**

K.A.R., formerly K.A.L. (hereinafter "Wife"), brings this appeal[1] from

the order entered September 6, 2013, in the Court of Common Pleas of

Allegheny County, dismissing in part her Exceptions to the Report and

Recommendation of the Master, and granting the Exceptions filed by T.G.L.

(hereinafter "Husband"), in this action brought by Wife to enforce the

parties' equitable distribution agreement.  Wife claims the trial court erred in

ruling (1) that Husband's statute of limitations defense barred Wife's action

to enforce the parties' equitable distribution agreement, and (2) that

_____

[1] Because a consent order to seal the record was entered by the trial judge,
the parties' names have been replaced with initials, and other identifying
proper names have been replaced with generic labels.

Husband's laches defense barred Wife's action to enforce the parties' equitable distribution agreement. Based upon the following, we affirm.

The trial court has aptly stated the factual and procedural history, which we restate, in part:

> Husband and Wife married on June 17, 1988. Two children were born of the marriage [who] are both emancipated. Wife filed a Complaint in Divorce on January 29, 2000, and a decree in divorce was entered August 5, 2003. The parties participated in an Equitable Distribution hearing before Master Gary Gilman on August 21 and August 22, 2003. On the second day of the hearing counsel for the parties read an Equitable Distribution Agreement into the record. One marital asset the parties discussed in the Agreement was Husband's interest in his startup venture, [Business-1] (hereinafter referred to as "[Business-1]"). Counsel for Husband stated,
>
> > **With regard to [Business-1] stock, Husband would agree – or the parties I believe agree that in this contemplated agreement that of the first net after taxes of a million dollars [H]usband received from the sale of [Business-1] stock, if and when it would be sold, and/or of the sale of any warrants which Husband has in [Business-1] stock or any other benefits he derives from the disposition of his interest in [Business-1] as it stands right now, as to the first million dollars of that net, after taxes, Wife would receive 50 percent – I'm sorry – Wife would receive 45 percent, Husband would receive 45 percent and 10 percent would be invested in a vehicle for the Children … And with regard to any amount over that first million net, again, defining the proceeds broadly to include remuneration of any kind other than his salary or wages which he would receive from the disposition of what currently exists as of today, it would be split 75 percent to Husband, 15 percent to Wife, 10 percent to the Children.** (8/22/2003 H.T., at 72–3).

Wife served Husband a Petition to Enforce the Equitable Distribution Agreement and for Sanctions on March 21, 2011 (hereinafter referred to as the "Petition to Enforce"). The Petition to Enforce asserted, *inter alia*, that Husband sold a portion of his [Business-1] stock in January 2004[, that the total sale was completed] for approximately $22 million[, and that Wife believes Husband received initial proceeds in excess of $2.5 million.] Wife also stated that Husband retained the advertising component of [Business-1] as part of the initial transaction, which was renamed [Business-2]. She claimed that [Business 2] subsequently became [Business-2A], and Husband then sold his interest in [Business-2A]. Wife alleged that Husband retained all the funds from the transaction. Wife averred that Husband made a payment to her of $300,000 on April 9, 2004 and a second payment of $150,000 to her on September 15, 2005. Wife further alleged that Husband failed to include any interest component for the delayed payments. [Wife averred that based upon the limited information provided by Husband, she believed she was owed over $300,000 for her share of the sale proceeds from Business-1 and Business-2/Business-2A.] Wife asked the Court, *inter alia*, to schedule a hearing to address Wife's claim for enforcement of the Equitable Distribution Agreement.

On March 30, 2011 Husband served Wife an Answer to the Petition to Enforce, New Matter and Counter Petition. Husband stated that Wife's interests in [Business-1] were limited to Husband's ownership rights as they existed on August 22, 2003,[1] and Wife was not entitled to any future consideration given to Husband for the future commitments he made as part of the [Business-1] transaction. Husband stated that Wife's interests were limited to the after-tax proceeds that he would have received if his stock were treated the same as all common shares because he only held common stock in [Business-1] on August 22, 2003. Husband further stated that he retained no ownership interest in [Business-1] after the January 2004 sale and that [Business-2A] was completely distinct from [Business-1]. Husband averred that he overpaid Wife $152,887.28 for her share of what he received for the [Business-1] stock and asked that Wife repay this amount to him along with interest.[2]

_____

- 3 -

[1] This is the date that the Equitable Distribution Agreement was read into the record.

[2] Husband stated that he would have received a pre-tax payment of $846,475 as a result of the [Business-1] transaction if his shares were treated as common shares. Under Husband's calculations this would have yielded after-tax proceeds of $660,000, which would entitle Wife to $297,112.73. Husband stated that he had paid Wife $450,000 with respect to [Business-1], which is an overpayment in the amount of $152,887.28

_____

\*\*\*\*

The four (4) day hearing to address Wife's Petition to Enforce took place before Master [Patricia] Miller [on March 20, 2012, May 29, 2012, May 31, 2012, and August 30, 2012]. Master Miller entered her Report and Recommendation on September 28, 2012. In this Report the Master determined that no agreement was formed between the parties on August 22, 2003. The Master found that Wife's decision to discharge her attorney after the parties' counsel discussed the disposition of the [Business-1] stock on the record, to sue him for malpractice, and to state in verified pleadings that there was no valid agreement was sufficient evidence that an agreement never existed. The Master also concluded that it was not clear if even Husband believed there was an agreement that he was to pay Wife 45% of the first $1,000,000 he received for the sale of his [Business-1] stock. The Master stated that either party could praecipe for an equitable distribution hearing to determine the marital property component of the [Business-1] stock and the percentage distribution to each party.

Husband and Wife filed Exceptions to the Report and Recommendation of Master Miller on October 18, 2012. …

\*\*\*\*

After the parties argued Exceptions on August 29, 2013, the Court entered its September 6, 2013 Order that granted in part

Wife's Exceptions to the Report and Recommendation of Master Miller. The Court found that the Master ruled on an issue that was not before her [namely, the validity of the agreement], that the Master failed to rule on the issues referred to her by the August 19, 2011 Order of Court [namely, Husband's affirmative defenses of statute of limitations and/or laches], that a valid equitable distribution agreement exists between Husband and Wife, and that an equitable distribution hearing was not to be scheduled. The Order dismissed Wife's remaining Exceptions. The Order also granted Husband's Exceptions to the Report and Recommendation of Master Miller [that asserted Wife's claims were time barred by the statute of limitations and the doctrine of laches]. The Court found that Husband's defenses of statute of limitations and laches bar enforcement of the Equitable Distribution Agreement. The Order also resolved all remaining economic issues between Husband and Wife.

Wife filed her Notice of Appeal to the September 6, 2013 Order of Court on September 30, 2013, and she thereafter filed her Concise Statement of Matters Complained of on Appeal on October 1, 2013.

Trial Court Opinion, 12/2/2013, at 1–6 (emphasis supplied).

Preliminarily, we note that "[a] question regarding the application of the statute of limitations is a question of law." *Commonwealth v. Riding*, 68 A.3d 990, 993 (Pa. Super. 2013). Furthermore, "the question of whether laches applies is a question of law." *United National Insurance Co. v. J.H. France Refractories Co.*, 668 A.2d 120, 124 n.4 (Pa. 1995). "Our standard of review over questions of law is *de novo* and to the extent necessary, the scope of our review is plenary as [the appellate] court may review the entire record in making its decision." *Stamerro v. Stamerro*, 889 A.2d 1251, 1257 (Pa. Super. 2005) (quotations and citation omitted).

However, we are bound by the trial court's credibility determinations. ***Id.*** at 1257–1258.

Wife first contends that the trial court erred in ruling the statute of limitations barred the present action to enforce the parties' agreement. Wife argues that the parties' agreement is a "continuing contract."

The statute of limitations for contracts is four years. 42 Pa.C.S. § 5525(a)(8). "[T]he statute of limitations begins to run as soon as the right to institute and maintain a suit arises." ***Fine v. Checcio***, 870 A.2d 850, 857 (Pa. 2005) (citation omitted). However, "[w]hen a contract is continuing, the statute of limitations will run either from the time the breach occurs or when the contract is terminated." ***Crispo v. Crispo***, 909 A.2d 308, 313 (Pa. Super. 2006) (*citing* ***S.T. Hudson Eng'rs, Inc. v. Camden Hotel Dev. Assocs.***, 747 A.2d 931, 934 (Pa. Super. 2000)). "The test of continuity, so as to take the case out of the operation of the statute of limitations, is to be determined by the answer to the question whether the services were performed under one continuous contract, whether express or implied, with no definite time fixed for payment, or were rendered under several separate contracts." ***Thorpe v. Schoenbrun***, 195 A.2d 870, 872 (Pa. Super. 1963).

Wife argues that the parties' equitable distribution agreement is a continuing contract because, as part of the January, 2004 Business-1 sale, Husband acquired an interest in Business-2A, which was part of 2006 and

2009 transactions that netted Husband additional proceeds to which Wife is entitled to under the parties' agreement. *See* Wife's Brief at 23. Wife points to the language in the parties' agreement stating, "Wife was to receive 45% of the initial million dollars, net after taxes, from the sale of [Business-1] stock, if and when it would be sold, and/or of the sale of any other warrants which Husband had in [Business-1] stock or *any other benefits [Husband] derived from the disposition of his interest in [Business-1]*." Wife's Brief at 23 (italics in brief). Wife contends Husband had a continuing obligation extending through the 2009 [Business-2A] transaction, which was less than four years prior to the date she filed her petition to enforce. *See id.* at 25. In support of her argument that the equitable distribution agreement was a continuing contract, Wife cites *Miller v. Miller*, 983 A.2d 736 (Pa. Super. 2009), *appeal denied*, 998 A.2d 961 (Pa. 2010) and *Crispo v. Crispo, supra*.

In *Miller, supra*, the defendant/husband was obligated by the parties' post nuptial separation agreement to pay the mortgage, taxes and insurance on the marital residence. *Id.* at 738. After the husband stopped making payments based upon a 1996 interim order of child support that directed plaintiff/wife to pay the mortgage from husband's child support payments, wife filed a petition for enforcement of the parties' agreement in 2005. *Id.* at 738–739. Husband argued that the applicable four-year statute of

limitations barred wife's claim for reimbursement of payments she made before November 15, 2001 (*i.e.,* four years prior to when she filed her petition for enforcement on November 15, 2005). *Id.* at 743. This Court rejected husband's argument, determining that the parties' agreement was a continuing contract. The Court found that husband continued to owe payments on the marital residence, and noted that the agreement did not set a specific deadline by which to make the payments and did not identify specific amounts owed. *Id.*

In *Crispo, supra*, 909 A.2d 308 (Pa. Super. 2006), the parties entered into a property settlement agreement that detailed various payments and debts each party would pay. *Id*. at 309–10. After husband failed to make payments, wife filed a petition for contempt and/or enforcement of the property settlement agreement. *Id*. at 309. The trial court found husband in contempt and ordered him to fulfill the terms of the settlement agreement. *Id*. at 311. Husband appealed, claiming the four-year statute of limitations for contracts and marriage settlement agreements applied to wife's claims. *Id*. This Court disagreed, concluding that the parties' agreement was a continuing contract and the statute of limitations defense was inapplicable. *Id*. at 315. In this regard, the Court noted that their agreement did not contain a specific deadline by which the debts were to be paid, and that wife continued to make payments to satisfy the debts

that were husband's obligation. The Court also noted that there was no specific start date in the agreement for husband's installment payments to wife for the $22,500 amount he had agreed to pay her as her fair share of the interest in his business. *Id.* at 313–314.

Here, however, as the trial court aptly explained, the present case is distinguishable from *Miller* and *Crispo*:

> Wife argues in her Brief in Support of Exceptions that "the parties' agreement is a continuing contract because Husband was not fully compensated for the sale of [Business-1] in a lump sum, and he had a continuing obligation to pay Wife her share of further monies received as a result of the sale." (Wife's Brief in Support of Exceptions, p. 17). This is an inaccurate conclusion in light of the terms of the Equitable Distribution Agreement and the evidence before the Court. The Equitable Distribution Agreement states, in relevant part, that,
>
> > ... of the first net after taxes of a million dollars husband received from the sale of [Business-1] stock, *if and when it would be sold*, and of the sale of any other warrants which Husband has in [Business-1] stock or any other benefits he derives from the disposition of his interest in [Business-1] *as it stands right now* ... Wife would receive 45 percent, Husband would receive 45 percent, and 10 percent would be invested in a vehicle for the Children ... And with regard to any amount over that first million net, again, defining the proceeds broadly to include remuneration of any kind other than his salary or wages *which he would receive from the disposition of what currently exists as of today*, it would be split 75 percent to Husband, 15 percent to Wife, 10 percent to the Children. (8/22/03 H.T. pp. 72-3) (emphasis added).
>
> First, the "if and when" language in the Equitable Distribution Agreement clearly sets a "definitive time fixed for payment": Wife's right to receive a percentage of Husband's remuneration from the sale of the [Business-1] stock arose when

Husband disposed of this stock. Since Husband sold all of his [Business-1] stock in the January 22, 2004 [] merger, January 22, 2004 is the date that Wife became entitled to payment from Husband. (Husband's Exhibit 32, §13).

… As of November 4, 2003, Husband owned 2,370,000 shares of voting common stock. (Wife's Exhibit N). Husband testified at the Petition to Enforce hearing that the pre-tax market value of this amount of common stock on January 22, 2004 was worth approximately $850,000. (3/20/12 H.T., p. 162). Husband further testified that he received a stay bonus as a part of the transaction. Husband was allocated this bonus by a Corporate Resolution passed by the Shareholders and Directors of [Business-1] on January 15, 2004. (Husband's Exhibit 32). Husband testified that this bonus was received because of the future commitments he made [], including staying on with [Business-1] as an employee at a reduced compensation, assigning his future intellectual property rights, signing a long-term noncompete, indemnifying the entire merger, and initiating and forming an advertising initiative ([Business-2A]). (3/20/12 H.T., p. 163). Husband contends that these future commitments and any monies associated therewith were not available to Wife under the Equitable Distribution Agreement, ….

****

Wife likens the Equitable Distribution Agreement to the property settlement agreements in **Crispo** and **Miller**. She argues that the Equitable Distribution Agreement is a continuing contract that required Husband to pay Wife a percentage of all proceeds he received from the sale of the [Business-1] assets as those assets were sold. (Wife's Brief in Support of Exceptions p. 18). Wife further argues that there is no manner in which the Court could determine any specific date on which Husband was required to make payments under the parties' agreement and it does not identify specific amounts owed. (Wife's Brief in Support of Exceptions p. 18).

As discussed *supra,* the "if and when" language of the Equitable Distribution Agreement sets a specific time for payment to Wife: when Husband sold his [Business-1] stock, his duty to compensate Wife arose simultaneously. Since Husband

disposed of all of his [Business-1] stock on January 22, 2004, payment to Wife became due on this date. The specific amounts owed from Husband to Wife are also identified in the Equitable Distribution Agreement. Under the Agreement Wife would receive 45% of the net proceeds up to the first million dollars that Husband reaped from the sale of his [Business-1] stock, and Wife would thereafter receive 15% of the net proceeds above the first million dollars. Since the sale of the [Business-1] stock had not yet occurred at the time the Equitable Distribution Agreement was entered on the record, the Court finds that the identification of percentages owed to each party are appropriate proxies for specific dollar amounts.

In consideration of the above, the Court holds that the Equitable Distribution Agreement sets a definitive time for payment from Husband to Wife and is distinguishable from the property settlement agreements in *Crispo* and *Miller*. ….

Trial Court Opinion, *supra*, at 9–13.

We agree with the trial court's analysis. The "if and when" language of the agreement provided that the date that Husband sold the Business-1 stock — here, January 22, 2004 — was the specific date when Husband became obligated to make payment to Wife for the Business-1 sale. Moreover, the parties' agreement identifies the amount owed to Wife, in terms of percentages of net proceeds received by Husband. Accordingly, we conclude Wife's first argument presents no basis to disturb the trial court's determination that the parties' agreement is not a continuing contract and that the statute of limitations bars the present action.

Alternatively, Wife claims that if the statute of limitations is applicable, the statute of limitations was tolled by: (1) the writ of summons filed by

- 11 -

Wife, (2) the discovery rule, (3) Husband's concealment and the parties' ongoing negotiations, and (4) Husband's acknowledgement of his obligation to Wife. We are not persuaded by these arguments.

We first address Wife's argument that the statute of limitations was tolled by the writ of summons she filed on January 20, 2005, in the Civil Division of the Allegheny County Court of Common Pleas, against Husband and Husband's wife with a demand for a jury trial. The record supports the trial court's finding that Wife's deposition testimony, taken during her legal malpractice action against her attorney whom she discharged after the parties' agreement was made of record, evidences that she had filed the writ against Husband and a separate writ against Husband's attorney to protect her ability to bring a fraud action in relation to the malpractice action, and not to protect her interests in this enforcement action.[2] **See** Trial Court Opinion, 12/2/2013, at 24. **See also** N.T., 8/30/2012, at 259, 267; Husband's Exhibit 59 § 12. Wife, however, contends that she filed the writ against Husband to preserve **all** her legal claims against him. In this regard, Wife points to her then counsel's November 1, 2005 letter to Husband,

_____

[2] In fact, on January 14, 2005, less than one week before Wife filed the writ, Wife sent Husband an email, stating, in part: "'The statute of limitations for fraud in PA is one year, so suit will be filed before the anniversary of the [January 22, 2004] sale.'" N.T., 3/20/2012, at 84; Husband's Exhibit 9.

demanding Husband's payment of additional monies and stating, if Husband did not agree to payment, Wife would "pursue the fraud claim and all other legal claims and remedies against you[.]" Wife's Exhibit II, Letter from Wife's Attorney to Husband, 11/1/2005. *See* Wife's Brief at 29. *See also* N.T., 5/29/2012, at 245–246.

Wife relies on case law that allows a party to file an enforcement action under § 3105 of the Divorce Code[3] and a separate action in the civil division on the property settlement agreement itself, and maintains that, because she filed the writ, she can still file a complaint in the civil division at any time.[4] Wife, however, cites no authority that supports the application of a writ of summons in a civil action to an enforcement proceeding under

---

[3] Section 3105 of the Divorce Code provides, in pertinent part:

> *(a) Enforcement.* --A party to an agreement regarding matters within the jurisdiction of the court under this part, whether or not the agreement has been merged or incorporated into the decree, may utilize a remedy or sanction set forth in this part to enforce the agreement to the same extent as though the agreement had been an order of the court except as provided to the contrary in the agreement.

23 Pa.C.S. § 3105(a).

[4] *See* Wife's Brief at 31–32, citing*, inter alia*, ***Nicholson v. Combs***, 703 A.2d 407, 417 (Pa. 1997); ***Peck v. Peck***, 707 A.2d 1163, 1164 (Pa. Super. 1998).

- 13 -

the Divorce Code.[5]   Therefore, we agree with the trial court that "Wife's claims in the current enforcement action could not and cannot be preserved by a Writ of Summons[.]"   Trial Court Opinion, 12/2/2013, at 24. Accordingly, Wife's reliance on the writ of summons to toll the statute of limitations fails.

Next, Wife claims that the discovery rule tolls the statute of limitations.

> The discovery rule is a judicially created device that tolls the running of the applicable statute of limitations until that point when the plaintiff knows or reasonably should know: (1) that he has been injured; and (2) that his injury has been caused by another party's conduct.

**Weik v. Estate of Brown**, 794 A.2d 907, 909 (Pa. Super. 2002) (citation omitted), *appeal denied*, 813  A.2d 844 (Pa. 2002).

> Whether the statute of limitations has run on a claim is a question of law for the trial court to determine; but the question as to when a party's injury and its cause were discovered or discoverable is for the [factfinder].

**Fine v. Checcio**, **supra**, 870 A.2d at 859.

_____

[5] **Compare** Pa.R.C.P. 1007 ("An action may be commenced by filing with the prothonotary (1) a praecipe for writ of summons, or (2) a complaint.") with Pa.R.C.P. 1920.12 (regarding complaint as to cause of action of divorce or for annulment) and Pa.R.C.P. 1920.43(a)(3) (providing procedure for special relief in divorce or annulment actions; "At any time after the filing of a complaint, on petition setting forth facts entitling the party to relief, the court may, upon such terms and conditions as it deems just, including the filing of security, …  grant other appropriate relief.").

Pennsylvania's formulation of the discovery rule reflects a narrow approach "to determining accrual for limitations purposes" and places a greater burden upon Pennsylvania plaintiffs vis-à-vis the discovery rule than most other jurisdictions. The commencement of the limitations period is grounded on "inquiry notice" that is tied to "actual or constructive knowledge of at least some form of significant harm and of a factual cause linked to another's conduct, without the necessity of notice of the full extent of the injury, the fact of actual negligence, or precise cause."

***Gleason v. Borough of Moosic***, 15 A.3d 479, 485 (Pa. 2011) (citations omitted).

Wife claims the statute of limitations could not have begun to run until after Husband provided her with his relevant tax returns in the summer of 2011 and 2012 pursuant to court order, because only then was she able to verify the correct amounts of the 2004 sale of Business-1 and the 2006 and 2009 Business-2A transactions. ***See*** Wife's Brief at 34–35. The trial court, however, found that after Wife learned of the January, 2004 Business-1 sale,[6] Husband provided Wife with distribution spreadsheets explaining the amounts Husband received from the sale, which Wife acknowledged by a notation on the documents in April 2004. Additionally, the trial court found that Husband provided Wife with the closing binder of the Business-1

---

[6] Wife testified she learned about the Business-1 sale, and the new company, Business-2A, in April, 2004, when a friend sent her a newspaper article about the sale. ***See*** N.T., 3/20/2012, at 45; N.T., 5/29/2012, at 175–178. ***See also*** Wife's Brief at 7–8.

transaction in early January of 2005, following which Wife sent Husband an email on January 14, 2005, indicating that she still believed Husband owed her money under the parties' equitable distribution agreement.[7]  **See** Trial Court Opinion, 12/2/2013, at 14–15.  These findings are supported by the record.  Furthermore, we agree with the trial court that the January 14, 2005 date of Wife's email to Husband must be considered the latest date for application of the discovery rule, as she evidenced her belief at that time that she had suffered harm.  Therefore, the statute of limitations expired on January 14, 2009, over two years before Wife filed her petition for enforcement.  Accordingly, we conclude the discovery rule does not save Wife's petition from Husband's statute of limitations defense.

Wife further claims that the statute of limitations was tolled by Husband's concealment and the parties' negotiations.

> [T]he doctrine of fraudulent concealment serves to toll the running of the statute of limitations. The doctrine is based on a

---

[7] The January 14, 2005 email exchange between Wife to Husband included the following message from Wife to Husband:

> You obviously received millions of dollars in a cash deal on January 22, 200[4].  That fact is not subject to interpretation.  I now have information inconsistent with the homemade spreadsheets I received from you in April.  Meeting with you gets me nowhere, because it is what it is.  I'm not interested in re-forming the deal.  I want a check tonight.

Husband's Exhibit 9; **see** N.T., 3/20/2012, at 86–87.

theory of estoppel, and provides that the defendant may not invoke the statute of limitations, if through fraud or concealment, he causes the plaintiff to relax his vigilance or deviate from his right of inquiry into the facts. The doctrine does not require fraud in the strictest sense encompassing an intent to deceive, but rather, fraud in the broadest sense, which includes an unintentional deception. The plaintiff has the burden of proving fraudulent concealment by clear, precise, and convincing evidence.

**Fine v. Checcio, supra**, 870 A.2d at 860 (citations omitted).

Wife asserts that Husband concealed the amount of monies he received from the Business-1 transaction. Wife contends that Husband, through counsel, "averred that he received no more than $1,000,000" and "state[d] Wife was overpaid,"[8] and in support of this argument points to a May 7, 2007 letter from Husband's counsel. However, the letter itself belies Wife's claim. Counsel's letter stated that counsel had "no information [related to the sale of Business-1] other than what [Husband] advised me, which is that all of the monies were paid." Wife's Exhibit G; N.T., 3/20/2012, at 270. Counsel further stated: "I believe that it is true [Husband] has paid [Wife] all or perhaps in excess of the amount he owed pursuant to the equitable distribution settlement." **Id.** Counsel made no representation concerning the amount Husband received from the Business-1 sale. Further, counsel's statement that Husband had satisfied his

_____

[8] Wife's Brief at 37–38.

obligation to Wife was not a misrepresentation of the amount received by Husband for the sale of Business-1.

Next, Wife points to "Husband's testimony herein claiming receipt of only $850,000, while his tax return for 2004 shows receipt of $2.6 million and his 2006 and 2009 tax returns show receipt of additional funds that are in excess of $1 million." Wife's Brief at 38. Husband's testimony at the hearings before the master, however, could not have misled Wife.[9]

Wife argues that "Husband has taken the position in a letter from counsel, his answer to Wife's petition to enforce and his testimony herein, that he had no further obligation to Wife; this notwithstanding that for years Husband has negotiated the further amount due Wife, acknowledging such debt and interest owing for such debt." Wife's Brief at 39-40. This argument, however, ignores the well settled principle that settlement negotiations do not toll the statute of limitations. *Nesbitt v. Erie Coach Company*, 204 A.2d 473 (Pa. 1964). To the extent that Wife relies on *Nesbitt* for the proposition that "if through fraud or concealment the defendant causes the plaintiff to relax his vigilance or deviate from his right

_____

[9] The record reflects that Husband testified at the petition to enforce hearing that he received $2.6 million in cash for the Business-1 stock and a stay bonus. He stated the common shares he held in Business-1 on August 22, 2003, had a value of $850,000 on January 22, 2004. *See* N.T., 3/20/2012, at 293.

of inquiry, the defendant is estopped from invoking the bar of limitation of action,"[10] we conclude, based upon our rejection of Wife's concealment arguments, that **Nesbitt** has no application to the present case. Therefore, we find Wife's argument that the statute of limitations was tolled by Husband's concealment and settlement negotiations presents no basis upon which to disturb the trial court's decision.

In addition, Wife asserts that Husband's acknowledgement of his obligation to Wife precluded Husband's statute of limitation defense.

> Pursuant to the "acknowledgement doctrine," a statute of limitations may be tolled or its bar removed by a promise to pay the debt.
>
>> A clear, distinct and unequivocal acknowledgement of a debt as an existing obligation, such as is consistent with a promise to pay, is sufficient to toll the statute. There must, however, be no uncertainty either in the acknowledgement or in the identification of the debt; and the acknowledgement must be plainly referable to the very debt upon which the action is based; and also must be consistent with a promise to pay on demand and not accompanied by other expressions indicating a mere willingness to pay at a future time. ***A simple declaration of an intention to discharge an obligation is not the equivalent of a promise to pay, but is more in the nature of a desire to do so, from which there is no implication of a promise.***

**Huntingdon Fin. Corp. v. Newtown Artesian Water Co.**, 659 A.2d 1052, 1054 (Pa. Super. 1995) (citations omitted) (emphasis added).

---

[10] **Nesbitt, supra**, 204 A.2d at 475 (citations omitted).

Contrary to Wife's claim, the record fails to show that Husband acknowledged a debt to Wife. Here, Wife, on November 20, 2007, sent an email to Husband in which she stated that she would be willing to accept $200,000 to resolve the outstanding equitable distribution claims. Husband's Exhibit 24; N.T., 3/20/2012, at 215–226. Subsequently, Husband emailed Wife on May 27, 2009, stating "I just want to verify that the final payment of $200,000 (plus an interest amount accruing from last spring which we still need to specify and agree upon) will complete the payments under our settlement agreement. Please verify this so I can give you a check this evening." Husband's Exhibit 29; N.T., 3/20/2012, at 230. Husband's willingness to accept Wife's proposal was not the acknowledgement of a debt. Husband had maintained that he had overpaid Wife.[11] Nor was there a promise to pay $200,000 on demand. Husband's

_____

[11] Following Husband's May 27, 2007, email, Wife emailed Husband on May 28, 2009, seeking to condition the $200,000 payment upon "authorization if ever needed to review the appropriate documents," and Husband answered,

> We need to discuss then. You can have access to whatever information you want and we can then determine what is owed under the Settlement Agreement. As you know, we have different perspectives on what that may be. My perspective is that I have paid more than my obligation – your position is that I have paid less. As part of a proposed settlement to get everything resolved, you and [your attorney] presented to me this dollar amount ($200,000) and said let's call it complete —

*(Footnote Continued Next Page)*

response asking Wife "to verify that the final payment of $200,000 … will complete the payments" was a settlement negotiation – "a simple declaration of an intention to discharge an obligation,"[12] which is not the equivalent of a promise to pay. Accordingly, the statute of limitations was not tolled where Husband did not acknowledge a debt to Wife.

Finally, Wife claims that the trial court erred in ruling that Husband's laches defense barred Wife's action to enforce the parties' equitable distribution agreement.

"The doctrine of laches is applicable when two conditions are satisfied: 'the complaining party must be guilty of a want of due diligence in failing to assert his rights and the failure must have worked to the prejudice of the party seeking its application.'" *In re Estate of Bowman*, 797 A.2d 973, 977 (Pa. Super. 2002) (citation omitted)).

Wife asserts that the parties' agreement was a continuing contract, and therefore, the doctrine of laches cannot be applied in this matter.

_(Footnote Continued)_ ————————————

> please remember that you and [your attorney] came up with that number — not me."

Husband's Exhibit 29; N.T., 3/20/2012, at 230, 232–233.

[12] *Huntingdon Fin. Corp. v. Newtown Artesian Water Co., supra*, 659 A.2d at 1054.

Furthermore, Wife contends that neither condition for application of the doctrine of laches was met in this case. These arguments fail.

As discussed above, the parties' equitable distribution agreement is not a continuing contract. Moreover, we conclude that the trial court committed no error in finding that the conditions for application of the laches defense were met in this case. *See In re Estate of Bowman, supra*. In this regard, we adopt the discussion of the trial court as dispositive:

> The Court finds that Wife's actions in this matter invoke the doctrine of laches. The evidence shows that Husband provided Wife in January 2005 the materials that explained the [Business-1] transaction. In February 2006 Husband offered to arrange a meeting between the transactional attorney who helped effectuate the [Business-1] transaction and Wife to discuss the closing documents. (Husband's Exhibit 9; Husband's Exhibit 22). Wife's counsel took advantage of this opportunity (although he refused to discuss the documents with either Husband or the transactional attorney) later that month. After two examinations of the [Business-1] closing documents performed by Wife and/or her agent, followed by Wife's consistent assertions that Husband owed her more money under the Equitable Distribution Agreement, the Court finds that Wife did not exercise due diligence in the pursuit of her claim by filing the present action five (5) years after these events took place.
>
> The Court further finds that Husband was prejudiced by Wife's actions because he made a $150,000 payment to Wife under the pretenses that this amount would resolve the parties' equitable distribution issues. Even though Husband believed that he paid Wife the correct amount due to her closely following the [Business-1] sale (a sum of $300,000), Husband paid Wife an additional $150,000 in September 2005 in an attempt to completely settle the matter. Wife, however, continued to pursue more funds under the Equitable Distribution Agreement. This clearly prejudiced Husband because he believed that the payment of this amount to Wife would end their dispute and

- 22 -

quell the possibility of any further court action. If Wife sought to enforce her claims in a timely manner, it is likely that Husband would have withheld any payments to Wife and waited until the Court disposed of the conflict.

Since the two prongs of the "doctrine of laches" test have been met, Wife's claims are properly barred by the doctrine of laches.

Trial Court Opinion, 12/2/2013, at 27–28.

Accordingly, we affirm.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>12/23/2014</u>