GAI CONSULTANTS, INC.

v.

**HOMESTEAD BOROUGH**

v.

**Redevelopment Authority of Allegheny County.**

**Steel Valley School District**

v.

**County of Allegheny, Redevelopment Authority of Allegheny County, Borough of Homestead, Borough of Munhall, Borough of West Homestead, Waterfront Partners.**

**Appeal of: Borough of Homestead.**

Commonwealth Court of Pennsylvania.

Argued April 14, 2015.
Decided July 8, 2015.

Joseph G. Heminger, Pittsburgh, for appellant.

Nicholas J. Evashavik, Pittsburgh, for appellee Borough of Munhall.

Donald C. Fetzko, West Mifflin, for appellee Steel Valley School District.

Stanley B. Lederman, Pittsburgh, for appellee Borough of West Homestead.

Howard M. Louik, Assistant County Solicitor, Pittsburgh, for appellee County of Allegheny.

BEFORE: BONNIE BRIGANCE LEADBETTER, Judge, and ANNE E. COVEY, Judge, and JAMES GARDNER COLINS, Senior Judge.

OPINION BY Senior Judge JAMES GARDNER COLINS.

The Borough of Homestead (Homestead) appeals from the entry of judgment against Homestead by the Court of Common Pleas of Allegheny County following a non-jury trial and the trial court's denial of Homestead's motions for post-trial relief. The primary basis of this appeal is Homestead's contention that the four-year statute of limitations for contract actions bars claims asserted by Allegheny County, Steel Valley School District (School District) and the Borough of Munhall (Munhall) to require the Redevelopment Authority of Allegheny County (Authority) to reimburse property tax assessment appeal refunds for pre–2010 tax years pursuant to a tax increment financing (TIF) agreement. For the following reasons, we affirm the trial court.

This appeal arises out of an effort by Homestead, Munhall, the Borough of West Homestead (West Homestead), Allegheny County and the School District (collectively, the Taxing Bodies) in conjunction with the Authority to raise finances to redevelop the former U.S. Steel Homestead Works site through the creation of the Waterfront Tax Increment Financing District (Waterfront District). The Waterfront District was created pursuant to the Tax Increment Financing Act[1] (Act), which was enacted in order to alleviate blight, promote economic growth and in-

crease the tax base by creating "an additional and alternative means to finance public facilities and residential, commercial and industrial development and revitalization." Section 2 of the Act, 53 P.S. § 6930.2. TIF is "a technique used by a municipality to finance commercial developments [usually] involving issuing bonds to finance land acquisition and other upfront costs, and then using the additional property taxes generated from the new development to service the debt." *Ondek v. Allegheny County Council*, 860 A.2d 644, 645 n. 2 (Pa.Cmwlth.2004) (quoting Black's Law Dictionary 1502 (8th ed. 2004)).

To implement a TIF redevelopment project, a redevelopment authority or industrial and commercial development authority must designate the boundaries of a TIF district, propose a project plan for its redevelopment, and meet with the municipalities and school districts which levy property taxes within the designated area to seek their approval for the plan. Section 5(a)(1)–(4) of the Act, 53 P.S. § 6930.5(a)(1)–(4). The TIF district is then created by municipal ordinance and each of the municipalities and other taxing bodies in which the TIF district lies must pass an ordinance or resolution to agree to participate in or opt out of the TIF project. Section 5(a)(6)–(7) of the Act, 53 P.S. § 6930.5(a)(6)–(7). Once the TIF district is created and project plan is adopted, the authority may issue tax increment bonds or notes in order to pay for project costs and establish a fund to pay additional project costs and the obligations on the bonds or notes. Sections 4 and 9 of the Act, 53 P.S. §§ 6930.4, 6930.9. All positive tax increments from the TIF district—that is, any incremental tax revenue as a result of the increase in property values or other

---

1. Act of July 11, 1990, P.L. 465, *as amended*      53 P.S. §§ 6930.1–6930.13.

commercial activity beyond a tax increment base level established at the outset of the project—are deposited into a fund administered by the authority until such time as the bonds, notes and other obligations associated with the financing of the redevelopment project are satisfied in full. Sections 3, 6 and 7 of the Act, 53 P.S. §§ 6930.3, 6930.6, 6930.7.

On September 15, 1998, following the creation of the Waterfront District and the adoption of the project plan, the Taxing Bodies, the Authority and a developer, Waterfront Partners, LLC, entered into an Agreement Regarding the Waterfront Tax Increment Financing District (TIF Agreement). (Reproduced Record (R.R.) at 79a–105a.) Pursuant to the TIF Agreement, the Taxing Bodies agreed to deposit all positive tax increments from property pledged to the Waterfront District in a bank account established by the Authority (TIF Fund). (TIF Agreement §§ 4, 5, R.R. at 83a–87a.) Pursuant to Section 6 of the TIF Agreement, the Authority was authorized to disburse funds in the TIF Fund, in the following order of priority: (i) to service bonds or notes issued in order to pay costs associated with improvements made to the Waterfront District; (ii) to pay directly for infrastructure and public improvement costs according to a schedule in the TIF Agreement; (iii) to pay for commercial development costs on certain properties within the Waterfront District; and (iv) to distribute at the end of each year any remaining money in the TIF Fund (Net TIF Revenues) to the Taxing Bodies according to a formula set forth in an exhibit to the agreement. (Id. §§ 6, 7, Ex. D, R.R. at 87a–88a, 103a–105a.) Most relevant to this litigation, Section 13 of the TIF Agreement sets forth the procedure for reimbursements to the Taxing Bodies for refunds paid to owners of properties within the Waterfront District following tax assessment appeals:

If at any time the Bank [that is the depository of the TIF Fund] receives moneys which are required to be refunded to the taxpayer of the Pledged Parcels as the result of an assessment appeal or otherwise, the Authority will cause such moneys to be paid to or at the direction of the appropriate Taxing Body. Refunds shall be made in the reverse order of priority as that set forth in Section 6.

(Id. § 13, R.R. at 89a.)

By all accounts, the redevelopment of the Waterfront District was a success with increased tax revenues sufficient to allow for all obligations to be paid and annual disbursements of Net TIF Revenues from the TIF Fund to the Taxing Bodies. (Trial Court Op. at 3; Transcript of Trial Testimony (N.T.) at 20, 47, 76–77, 116–17, R.R. at 538a, 565a, 594a–595a, 634a–635a.) The Authority's handling of reimbursements for property tax refunds, however, was inconsistent with reimbursements to the Taxing Bodies in some years and not others and reimbursements to Homestead in years when the other Taxing Bodies did not receive one. (Trial Court Op. at 4; N.T. at 18, 37–38, 41–42, 72, 94, R.R. at 536a, 555a–556a, 559a–560a, 590a, 612a.)

On January 17, 2012, the School District filed a declaratory action in the trial court naming the Authority, the Taxing Bodies and Waterfront Partners as defendants and seeking a declaration that the Authority had the contractual duty to direct the bank holding the TIF Fund to pay any assessment appeal refunds on properties pledged to the Waterfront District at the direction of the Taxing Body, regardless of the tax year. (R.R. at 16a–53a.) On July 26, 2012, GAI Consultants, Inc., an owner of a parcel pledged to the Waterfront District, filed an action in assumpsit in order to recover $34,535 from Homestead pursu-

ant to a determination by the Allegheny County Board of Property Assessment, Appeals and Review (Board) that lowered the market value of GAI Consultants' property from $10,137,500 to $6,684,000 for the 2010 tax year.[2] (R.R. at 62a–71a.) Homestead joined the Authority in this action, alleging that the Authority had breached its obligations under Section 13 of the TIF Agreement to make the refund. (R.R. at 108a–142a.) With all parties in agreement that GAI Consultants was entitled to a refund from Homestead, the trial court ordered the Authority to pay the refund out of the 2013 revenues in the TIF Fund with the proper accounting for the reimbursement reserved until after trial. (October 21, 2013 Order, R.R. at 448a.)

The trial court consolidated the two cases, and during the course of litigation, Munhall, the School District and Allegheny County asserted that the Authority was required to reimburse those Taxing Bodies for assessment appeal refunds that they had paid from their general funds dating to 2001.[3] Following a non-jury trial on February 18, 2014, the trial court entered an order on February 19, 2014 declaring that the Authority has a contractual duty under the TIF Agreement to direct the payment of the refunds from assessment appeals out of the TIF Fund and that the reimbursements for tax refunds shall be debited from the TIF Fund prior to the calculation and distribution of Net TIF Revenues at the end of each year. (February 19, 2014 Order ¶¶ 1, 3.) The trial court also ordered the Authority to direct the reimbursement to Allegheny County and the School District of refunds it had paid to GAI Consultants arising out of its 2010 assessment appeal. (*Id.* ¶ 2.) The trial court entered two additional orders on February 25, 2014 and March 11, 2014 ruling that the statute of limitations was not a defense to the claims of Munhall, Allegheny County and the School District for reimbursement of its pre–2010 assessment appeal refunds and requiring the Authority to direct reimbursement for those refunds from the TIF Fund. (February 25, 2014 Order; March 11, 2014 Order.)

Homestead filed motions for post-trial relief arguing that the claims of Munhall, Allegheny County and the School District for reimbursement of refunds of pre–2010 assessment appeals were barred by the statute of limitations. The trial court denied the post-trial motions in a May 22,

---

2. GAI Consultants initially filed suit on May 25, 2012, asserting a mandamus claim against the Borough Manager of Homestead to compel payment of the refund; following preliminary objections, GAI Consultants amended its complaint, dropping the mandamus claim in favor of the assumpsit action and naming Homestead instead of its Borough Manager. (Complaint, R.R. at 54a–61a; Amended Complaint, R.R. at 62a–71a.) In its complaints, GAI Consultants alleged that Allegheny County and the School District had already paid their portions of the refund while Homestead refused to do so. (Complaint ¶¶ 10–12, R.R. at 57a; Amended Complaint ¶¶ 15–17, R.R. at 66a.)

3. Munhall asserted in its July 18, 2013 answer and new matter to the consolidated ac-

tions that if the trial court determined that any Taxing Body was entitled to reimbursement for a refund for the 2010 tax year, then Munhall should be entitled to reimbursement for pre–2010 refunds that it had paid directly. (R.R. at 414a–418a.) At trial, the School District and Allegheny County also indicated that they were seeking reimbursement for pre–2010 refunds, and the trial court requested that Munhall, the School District and Allegheny County submit documentation of all the refunds paid directly out of their general funds as of the date of the trial. (N.T. at 53–54, 146–47, R.R. at 571a–572a, 664a–665a; February 19, 2014 Order ¶ 6; School District Ex. 4, R.R. at 508a–512a; Allegheny County Ex. 1, R.R. at 513a–518a; List of Property Taxes Refunds Paid by Munhall Borough, R.R. at 835a–837a.)

2014 order, and Homestead appealed.[4] In the trial court's opinion issued pursuant to Rule of Appellate Procedure 1925(a), the trial court concluded that the TIF Agreement was a continuing contract and therefore the statute of limitations would not begin to run until the termination of the contractual relationship in 2018.[5] (Trial Court Op. at 5–7.)

On appeal, Homestead [6] argues that the four-year statute of limitations for contract actions, *see* 42 Pa.C.S. § 5525(a), prevented Munhall, Allegheny County and the School District from asserting claims for reimbursement of refunds of assessment appeals due before 2010.[7] Homestead asserts that Section 13 of the TIF Agreement does not impose an obligation on the Taxing Body to demand reimbursement from the TIF Fund and instead the Authority has the obligation under the contract to pay a refund when "the Bank receives moneys which are required to be refunded to the taxpayer of the Pledged Parcels as the result of an assessment appeal or otherwise." (TIF Agreement § 13, R.R. at 89a.) Homestead argues that each failure of the Authority to cause a refund to be paid from the TIF Fund when the right to a refund comes due creates an immediate injury to the taxpayer, any Taxing Body that pays the refund from its general fund, and the Taxing Bodies collectively based on the resulting skewed accounting of TIF revenues and distributions. Thus, according to Homestead, the statute of limitations begins to run on the day a taxpayer becomes entitled to a property tax refund and any claim for reimbursement by a Taxing Body more than four years after the determination by the Board lowering an assessment is barred.

Homestead argues that the trial court erred in concluding that the TIF Agreement is a continuing contract, and contends that it is in fact a complex contract with multiple, divisible duties, the breach of any one of which would be actionable

4. By an order dated June 16, 2014, this Court directed Homestead to cause judgment to be entered on the docket below in order to proceed with this appeal, which the trial court did on June 25, 2014. Our scope of review of a judgment following a non-jury trial is limited to determining whether the trial court's factual findings are supported by competent evidence and whether the trial court committed an error of law. *McGaffic v. City of New Castle*, 74 A.3d 306, 310 n. 8 (Pa.Cmwlth. 2013) (*en banc*); *Commonwealth v. Hoffman*, 938 A.2d 1157, 1160 n. 10 (Pa.Cmwlth.2007).

5. The TIF Agreement does not have a fixed termination date but instead provides that it "shall have a term equal to the term of the [Waterfront] District." (TIF Agreement § 12, R.R. at 89a.) Under the Act, a TIF district may not terminate if any bonds or notes issued by the authority remain outstanding. Sections 7(a) and 8 of the Act, 53 P.S. §§ 6930.7(a), 6930.8. The TIF Agreement here provides that payments for obligations and project costs shall continue through 2018 and the parties acknowledged at trial this

time frame for the duration of the TIF Agreement. (TIF Agreement Ex. C, R.R. at 102a; Trial Court Op. at 6; H.T. at 20–21, 39, 73–74, R.R. at 538a–539a, 557a, 591a–592a.)

6. West Homestead did not file a separate notice of appeal of the trial court orders, but submitted a letter to this Court indicating that it adopted the arguments submitted by Homestead in its brief.

7. Homestead asserts on appeal that any refund due prior to February 18, 2010 is barred by the statute of limitations because Allegheny County, the School District and Munhall did not make reimbursement claims for pre–2010 tax years until the trial on February 18, 2014. (Homestead Br. at 24–25.) Homestead does not address, however, whether Munhall sufficiently asserted its claims for reimbursements for pre–2010 tax years in its July 18, 2013 answer and new matter or whether the School District's reimbursement claims relate back to its January 17, 2012 declaratory judgment action. Because of our disposition of this appeal, we need not address these issues.

and cause immediate damages to be suffered. Homestead asserts that the TIF Agreement does not satisfy the "test of continuity" because Section 13 of the TIF Agreement fixes the date of a determination by the Board to reduce an assessment as the specific date when the Authority is obligated to direct the payment of money from the TIF Fund to a taxpayer. Homestead argues that to interpret the TIF Agreement as a continuing contract and to allow a Taxing Body to assert a claim for reimbursement until 2022, four years after the expiration of the contract in 2018, would impermissibly burden the other Taxing Bodies by requiring them to make unforeseen adjustments to their budgeting and planning based upon lower than expected Net TIF Revenue distributions.

Homestead further argues that Munhall, Allegheny County and the School District cannot rely on either the discovery rule or the doctrine of *nullum tempus* to avoid the effect of the statute of limitations to bar their claims for reimbursement on pre–2010 assessment appeal refunds. Homestead argues that the discovery rule is inapplicable because Munhall, Allegheny County and the School District had all of the information necessary to know that the Authority was violating its obligations under the TIF Agreement, including annual accounting of the TIF Fund that showed all reimbursements paid to Taxing Bodies

for assessment refunds, at the time the violations occurred. Homestead also argues that the doctrine of *nullum tempus,* which provides that statutes of limitations do not bar actions brought by a state or its agencies, is inapplicable because the doctrine requires that the governmental party is acting pursuant to a mandatory obligation required by law, and the Taxing Bodies here were not constitutionally or statutorily compelled to participate in the TIF Agreement.

■ Upon review, we agree with the trial court that the TIF Agreement is an ongoing contract and that Section 13 of the TIF Agreement did not impose an obligation on the Authority to immediately pay refunds on tax assessment appeals or set a deadline for the Taxing Bodies to make claims for reimbursement on refunds paid. The TIF Agreement therefore meets the test for a continuing contract, and the reimbursement claims are not barred by the statute of limitations. Because we reach this conclusion, we need not address Homestead's additional arguments that the discovery rule and the doctrine of *nullum tempus* do not preclude its statute of limitations defense.[8]

■ In general, for a claim based upon contract, the cause of action accrues and the statute of limitations begins to run

---

**8.** Homestead also argues that it was not unjustly enriched as a result of the fact that the Authority reimbursed Homestead for assessment appeal refunds in years when it did not reimburse other Taxing Bodies because Homestead paid the highest proportional share into the TIF Fund and, except for two years, received the lowest proportionate share in Net TIF Revenues. The trial court, however, found that the Authority was obligated to reimburse the School District, Allegheny County and Munhall for pre–2010 assessment appeal refunds based on the terms of the TIF Agreement and not under a quasi-contract theory of unjust enrichment of Homestead.

As Homestead recognizes in its brief, unjust enrichment does not apply where an express contract exists between the parties. *Joyce v. Erie Insurance Exchange,* 74 A.3d 157, 169 (Pa.Super.2013); *Villoresi v. Femminella,* 856 A.2d 78, 84 (Pa.Super.2004). Thus, because claims premised on a breach of an express contract and unjust enrichment are mutually exclusive and the trial court here found a breach of Section 13 of the TIF Agreement, the issue of whether Homestead was unjustly enriched as a result of the Authority's inconsistent history of reimbursements to the Taxing Bodies is irrelevant to this appeal.

on the date that the contract is breached. *McGaffic v. City of New Castle*, 973 A.2d 1047, 1052 (Pa.Cmwlth.2009); *S.T. Hudson Engineers, Inc. v. Camden Hotel Development Associates*, 747 A.2d 931, 934 (Pa.Super.2000). However, "[i]f services are rendered under an agreement which does not fix any certain time for payment or for the termination of the services, the contract will be treated as continuous, and the statute of limitations does not begin to run until the termination of the contractual relationship between the parties." *Thorpe v. Schoenbrun*, 202 Pa.Super. 375, 195 A.2d 870, 872 (1963) (quotation omitted); *see also Jodek Charitable Trust, R.A. v. Vertical Net, Inc.*, 412 F.Supp.2d 469, 475–77 & n. 12 (E.D.Pa.2006) (holding under Pennsylvania law that the statute of limitations begins to run on a continuing contract at the time the contractual relationship ends rather than at the time of the breach); *Crispo v. Crispo*, 909 A.2d 308, 315 (Pa.Super.2006) ("[I]n the case of continuing contracts . . ., where the duties of the parties are ongoing, the statute of limitations generally does not run.") (quotation omitted); 31 Williston on Contracts § 79:21 (4th ed. 2015) ("It is often said that the contract under consideration was a continuing one, in support of decisions holding that the statutory period does not begin to run until the time when the final performance was due under the contract.").

The question of whether a contract is continuing hinges on whether the contract fixes a certain time for payment or the termination of services. *Thorpe*, 195 A.2d at 872. As the Superior Court explained in *Thorpe*:

> The test of continuity, so as to take the case out of the operation of the statute of limitations, is to be determined by the answer to the question whether the services were performed under one continuous contract, whether express or implied, with no definite time fixed for payment, or were rendered under several separate contracts.

195 A.2d at 872 (quotation omitted); *see also K.A.R. v. T.G.L.*, 107 A.3d 770, 775–76 (Pa.Super.2014). In contrast, under a contract "where installment or periodic payments are owed, a separate and distinct cause of action accrues for each payment as it becomes due." *American Motorists Insurance Co. v. Farmers Bank and Trust Company of Hanover*, 435 Pa.Super. 54, 644 A.2d 1232, 1235 (1994); *see also Ritter v. Theodore Pendergrass Teddy Bear Productions, Inc.*, 356 Pa.Super. 422, 514 A.2d 930, 935 (1986).

The concept of a continuing contract is most often presented in the context of professional service agreements. For example, in *Thorpe*, Dr. Thorpe, an ophthalmologist, began providing treatment to Mrs. Schoenbrun in 1934, including prescribing glasses for near-sightedness and a cataract operation in her left eye. 195 A.2d at 872. All services from 1934 through 1951 were billed and paid. *Id.* On July 7, 1952, Mrs. Schoenbrun visited Dr. Thorpe as a result of an infection in her right eye and an infection on the eyelid of her left eye. *Id.* Dr. Thorpe performed a cataract operation on Mrs. Schoenbrun's right eye and began treating her for glaucoma. *Id.* Though Dr. Thorpe had not yet completed his course of treatment, Mrs. Schoenbrun last visited his office on July 19, 1954 and she did not pay any of the invoices for her treatment on July 7, 1952 or after. *Id.* at 872–73. Dr. Thorpe commenced suit on July 12, 1960, within the six-year statute of limitations applicable at the time to contract actions as to Mrs. Schoenbrun's final visit to Dr. Thorpe but not as to the remainder of invoices which remained unpaid. *Id.* at 871. The Superior Court upheld the jury verdict in favor of Dr. Thorpe, concluding that there was suf-

ficient evidence for the jury to find that Dr. Thorpe and Mrs. Schoenbrun had entered into a continuing contract of interrelated services performed for the purpose of preserving her eyesight and that this contract extended at least until Mrs. Schoenbrun's last visit to Dr. Thorpe, which fell within the limitations period. *Id.* at 872–74.

Continuing contracts have also been found in other contexts, including marital support agreements. In *Miller v. Miller*, 983 A.2d 736 (Pa.Super.2009), a husband and wife entered into a post-nuptial agreement in 1994 in which the husband agreed to pay the mortgage, taxes and insurance on the marital residence until it was sold. *Id.* at 738. The wife brought suit in 2005 based on the husband's failure to pay the mortgage, taxes and insurance pursuant to the agreement. *Id.* at 738–39. On appeal, the Superior Court rejected the husband's argument that the statute of limitations barred any claim prior to the four-year limitations period, concluding that the post-nuptial agreement was a continuing contract because it did not set forth deadlines for payment of the mortgage, taxes and insurance or specify the amounts of payments to be made. *Id.* at 742–43; *see also Crispo*, 909 A.2d at 313–15 (concluding that property settlement agreement, which set forth a schedule of payments of marital debts, was a continuing contract because it did not provide a specific start date for the payments or a deadline by which the payments must be completed).

Here, we conclude that the TIF Agreement satisfies the *Thorpe* test of continuity because the services required of the Authority "were performed under one continuous contract" and had "no definite time fixed for payment." 195 A.2d at 872. The TIF Agreement sets forth various interconnected duties and obligations that the parties perform under one single agreement that runs until all Waterfront District redevelopment debts are satisfied. Pursuant to the TIF Agreement, the Authority was responsible for the overall administration of the TIF Fund and overseeing the redevelopment of the Waterfront District in order to implement the TIF project plan. The ongoing service required of the Authority is akin to the type of consultation and overarching management of the affairs of a client found in a professional service contract, such as in *Thorpe.*

Furthermore, the TIF Agreement imposes no specific time on the Authority to make a reimbursement for the refund. Section 13 provides that "[i]f at any time the Bank receives moneys which are required to be refunded to the taxpayer of the Pledged Parcels as the result of an assessment appeal or otherwise, the Authority will cause such moneys to be paid to or at the direction of the appropriate Taxing Body." (TIF Agreement § 13, R.R. at 89a.) Homestead argues that Section 13 places a duty on the Authority to determine when a refund is due and pay the refund without any request from the Taxing Body. However, Section 13 sets no deadline or date this argument would impose a requirement on the Authority to monitor property tax records in order to determine when a refund is due that is completely absent from the text. Homestead's argument also ignores the clear language of Section 13 providing that the Authority must direct that tax revenue in the TIF Fund that is owed as a refund be "paid to or *at the direction of* the appropriate Taxing Body." (*Id.* (emphasis added).) Section 13 thus by its own terms allows the Taxing Body the power to decide when the Authority shall make payment and whether to pay the refund directly from the TIF Fund or seek reimbursement for a refund already paid.

Because the TIF Agreement sets no specific time for reimbursement claims for property tax refunds, it is a continuing contract. Accordingly, the statute of limitations would not begin running until the termination of the contract relationship in 2018 and does not bar the reimbursement claims of the School District, Allegheny County or Munhall for pre–2010 property tax assessment appeal refunds. The entry of judgment against Homestead is affirmed.

### ORDER

AND NOW, this 8th day of July, 2015, the entry of judgment by the Court of Common Pleas of Allegheny County against the Borough of Homestead in the above-captioned matter is hereby affirmed.