# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Carmen Carulli and Barbara : 
Carulli, husband and wife :
 :
 v. :
 :
North Versailles Township :
Sanitary Authority :
 :
 v. :
 :
Port Vue Plumbing, Inc., : No. 751 C.D. 2017
            Appellant : Argued: October 17, 2018


BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
                HONORABLE RENÉE COHN JUBELIRER, Judge
                HONORABLE P. KEVIN BROBSON, Judge
                HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE ANNE E. COVEY, Judge
                HONORABLE CHRISTINE FIZZANO CANNON, Judge
                HONORABLE ELLEN CEISLER, Judge


OPINION
BY JUDGE FIZZANO CANNON        FILED: August 13, 2019


        Port Vue Plumbing, Inc. (Port Vue) appeals a judgment of the Allegheny County Court of Common Pleas (trial court) entered against Port Vue and in favor of North Versailles Township Sanitary Authority (Authority), awarding damages in the amount of $39,033.69 in a breach of contract action. In doing so, the trial court rejected Port Vue's claim that the four-year statute of limitations applicable to contract actions barred the Authority from bringing its claim. The trial court applied the discovery rule, reasoning that the Authority had no reason to know

of the breach until it received a complaint from residents alleging damage to their residence approximately 10 years later.  We vacate and remand.

## I. Background

In December 2002, the Authority contracted with Port Vue to replace terra cotta sewer pipes along Bevan Road in North Versailles Township.  Port Vue agreed to replace the pipes using the "pipe bursting" method, which bursts the existing pipe while simultaneously pulling through a new pipe.  Notes of Testimony 11/21/2016 (N.T.) at 75, Reproduced Record (R.R.) at 138a.  The portion of sewer line to be replaced stretched from manhole 755 to manhole 767.  Port Vue also contracted to excavate the new line to reconnect all residential sewer laterals to the new line.  In July 2003, Port Vue notified the Authority that it had completed work on the project and requested final payment, which was approved by the Authority's engineer.  Trial Court Opinion at 1.[1]  In accordance with the contract, the Authority paid Port Vue for completion of the project.  *Id.* at 1-2.

In March 2012, the Authority was notified that the basement of a house along Bevan Road belonging to Carmen and Barbara Carulli (together, Carullis) had flooded with raw sewage.  Trial Court Opinion at 2.  The Authority also discovered that manhole 767 was surcharged[2] to within several feet of its top.  *Id.*  The Authority inspected the sewage lines with a camera and discovered that 112.71 lineal feet of piping between manhole 766 and manhole 767 had not been replaced in accordance with the contract.  *Id.*  The Authority requested that Port Vue replace the sewer line

---

[1]  Pagination supplied beginning after cover page.

[2] A "[s]ewer surcharge refers to the overloading of the sewer beyond its design capacity due to inflow and infiltration of water.  A surcharging sewer often results in sewer overflow at manholes and customers' over flow relief gully[.]"  Sewer Surcharge, The Local Government Municipal and Knowledge Base, http://www.lgam.info/sewer-surcharge (last visited August 12, 2019).

between manhole 766 and manhole 767. *Id.* When Port Vue refused, the Authority retained another contractor, State Pipe Services, to replace the old sewer line. *Id.*

In September 2012, the Carullis filed a complaint for damages against the Authority. In response, on or about November 20, 2012, the Authority filed a complaint to join Port Vue as an additional defendant arising from Port Vue's alleged failure to fulfill its obligations under the contract. Trial Court Opinion at 2. The Carullis settled their claims, and the Authority and Port Vue proceeded to a non-jury trial.

Before the trial court, Port Vue argued that the statute of limitations bars the Authority's claims. Trial Court Opinion at 2. The parties did not dispute that Pennsylvania's statute of limitations for a breach of contract claim of this nature is four years. *Id.* (citing 42 Pa.C.S. § 5525(1)). The parties also did not dispute that Port Vue was not made a party to the lawsuit until nearly 10 years after it completed work on the project. *Id.* The Authority, however, claimed it was unaware that a section of the project was unfinished until those pipes caused the damage to the Carullis' home, and therefore, the discovery rule tolled the running of the statute of limitations. *See id.* at 2-3.

At trial, the Authority presented the testimony of Donald Glenn (Glenn), an engineer from the Authority's engineering firm, Glenn Engineering and Associates Ltd. N.T. at 10-11, R.R. at 73a-74a. Glenn testified that he designed the project for the Authority, which consisted of replacing the sewer lines, reconnecting the house laterals to the new line and installing additional manholes. N.T. at 11, R.R. at 74a. The project was to be completed in two phases. N.T. at 12, R.R. at 75a. Phase 1 started at manhole 755 and ended at manhole 764. *Id.* Phase 2 started at

3

manhole 764 and ended at manhole 767. *Id.* Port Vue contracted to do the work for both phases of the project. *See* N.T. at 13, R.R. at 76a.

Glenn testified that he was not at the site every day to inspect the work in progress. His colleague, Joseph Dursa (Dursa), and the Authority's representative, Jack Gaffney (Gaffney), were on-site. When asked if an individual could visibly inspect the new sewer line between manholes 764 and 767, Glenn testified that "you can't physically inspect" the pipe because there was no excavation of the pipe line. N.T. at 25-26, R.R. at 88a-89a. Further, the Authority did not have the physical equipment to do a camera inspection of the sewer line. N.T. at 59, R.R. at 122a. Glenn testified that Port Vue forwarded an invoice to him representing that the project had been completed, including bursting the entire line, and that based on such representation, Glenn authorized payment in full to Port Vue. N.T. at 24-25, R.R. at 87a-88a.

Glenn also testified about the incident that caused the damage to the Carullis' property. Glenn testified that after the incident, it was determined that the pipe bursting had not been done for the entire length as specified in the contract. N.T. at 27, R.R. at 90a. Glenn stated that this caused a backup in the sewer line and a surcharge at manhole 767. *Id.* Glenn testified that, after the incident, the Authority determined the line had collapsed using two methods: physical observation (climbing down a ladder in the manhole and shining a flashlight up and down the sewer) and inserting a camera. N.T. at 28-29, R.R. at 91a-92a. The inspection revealed that the old terra cotta pipe had collapsed and that a new liner had never been installed. N.T. at 27-29, R.R. at 90a-92a. Glenn testified that the backup in the sewer line and the surcharge at manhole 767, and the resulting photographs from the inspection, were the first indication that the sewer line had not been completed

4

all the way to manhole 767. *See* N.T. at 26-27, 31 & 81, R.R. at 89a-90a, 94a & 144a. Despite Port Vue's assertions to the contrary, Glenn testified that he never had a conversation with anyone at Port Vue, including owner Richard Perkoski (Perkoski), about doing other work instead of replacing the sewer line between manhole 764 and manhole 767. N.T. at 33, R.R. at 96a.

Glenn testified that under the contract, Port Vue was to furnish as-built drawings. N.T. at 32, R.R. at 95a. He stated he did not personally request that Port Vue submit as-built drawings after the contract was completed but that the request "would have come from one of my other people at the office." *Id.* Glenn testified that, to his knowledge, Port Vue did not supply Glenn Engineering or the Authority with as-built drawings. N.T. at 32-33, R.R. at 95a-96a.

Glenn also testified that after it was determined the terra cotta pipe collapsed, he told Port Vue it had to complete the project, but it refused, so the Authority contracted with, and paid, State Pipe Services to complete the work. N.T. at 29 & 32, R.R. at 92a & 95a.

On cross-examination, Glenn stated that the contract defines the scope of the work to be performed. N.T. at 36, R.R. at 99a. Glenn also acknowledged that the terms of the contract provided that the engineer could inspect the contractor's work at any time. N.T. at 38, R.R. at 101a. Glenn also testified that Glenn Engineering had assigned an inspector to the project, although not a full-time inspector, and that Gaffney, who worked for the Authority, was also an inspector. *Id.* Glenn acknowledged that the contract provided that the Authority's engineer was to perform a final inspection to determine whether the job was completed. *Id.* Glenn acknowledged that he certified that the work had been completed even though neither he nor anyone from his office did any type of inspection. N.T. at 53, R.R. at

5

116a. Glenn also reconfirmed that the Authority had determined that a portion of the line was not bursted when the Authority looked into manhole 767. N.T. at 56a, R.R. at 119a. Glenn also conceded that the work could have been visually inspected at any time without the aid of any type of camera, although he stated "[i]t would take of lot of effort to do that," explaining that "[y]ou would have to climb down, get a flashlight, [and] shine it[.]" *Id.* Glenn stated he "had no idea" whether that was done at any time between Port Vue completing its work in 2003 and when the backup incident occurred in 2012, "but obviously not." *Id.*

The Authority also presented Dursa's testimony; Dursa was a project representative from Glenn Engineering who inspected the work performed by Port Vue. N.T. at 103, R.R. at 166a. He explained that, at the beginning of the construction period, Port Vue laid out the new sections of pipe and fused the pipes together so that they could be pulled through the old terra cotta pipe during the bursting process. N.T. at 105, R.R. at 168a. Dursa explained that during the installation of the pipe,

> [y]ou really can't view [the actual bursting of the line], but you can just see the machines working, and it's pulling the pipe through that they had on site already put together behind the area [that] was dug out.

N.T. at 104, R.R. at 167a.

Dursa stated that in January 2003, when he arrived at the site, the machine that was used for pipe bursting had stopped working in the vicinity of manhole 766. *See* N.T. at 105, R.R. at 168a. He understood that Port Vue was evaluating the problem and attempting to get the machine working again. N.T. at 105-06, R.R. at 168a-69a. Thereafter, Dursa went on vacation, and upon his return, the equipment was no longer at the same location. N.T. at 107, R.R. at 170a. Dursa

6

testified that he never spoke to Perkoski about not completing the line replacement to manhole 767 and, instead, doing other work. N.T. at 108 & 110-11, R.R. at 171a & 173a-74a. On cross-examination, Dursa stated that he reviewed the contract documents before he started his inspections and that he had the contract documents on site, although he did not "have a copy on me[.]" N.T at 116-17, R.R. at 179a-80a. He acknowledged that he understood what Port Vue was supposed to do. N.T. at 119, R.R. at 182a.

John McDonald (McDonald) also testified for the Authority. McDonald was a foreman for State Pipe Services, which replaced the broken sewer line in 2012. N.T. at 85, R.R. at 148a. Initially, State Pipe Services performed a pre-inspection of the site using a camera. N.T. at 86, R.R. at 149a. After determining that the old terra cotta pipe had not been completely replaced, State Pipe Services continued the pipe bursting process to the top of manhole 767, thereby completing the project. N.T. at 88, R.R. at 151a.

Gaffney, a former foreman for the Authority at the time of the project, also testified for the Authority. N.T. at 191-92, R.R. at 254a-55a. Gaffney testified that he was instructed by the office manager and the Board of the Authority to check in daily if there was going to be any problems but it was not his position to inspect anything, and he did not, nor was he at the site daily. N.T. at 192-93, R.R. at 255a-56a. He confirmed that he never had a conversation with Perkoski about not completing the bursting of the line between manholes 766 and 767. N.T. at 193, R.R. at 256a. Regarding the visual inspection of a new sewer line, Gaffney explained:

> If it's an open cut, in other words, if they excavate and put
> the pipe in, both the engineer and myself if I'm in the area,

7

make sure that it's cemented out correctly with stone, make sure that there's good flow on it.

However, if the inspectors work by themselves, you don't go down into a sewer by yourself. It's a safety issue. By [Occupational Safety and Health Administration] standard, there should be three people on site.

I have never been there where it's just myself and/or Joe [Dursa]. So we don't make it a habit or standard to go down any sewers, manholes themselves because of safety issues.

N.T. at 199-200, R.R. at 262a-63a.

In its case, Port Vue called its President, Perkoski. N.T. at 127-28, R.R. at 190a-91a. Perkoski testified that throughout the duration of the project, his communications had been with Glenn Engineering. N.T. at 129-30, R.R. at 192a-93a. Perkoski explained that during phase 2 of the project, from manhole 764 to manhole 767, his workers encountered problems connecting some of the homes to the new sewer line. *See* N.T. at 140-41, R.R. at 203a-04a. They had to enter the basements of these houses, cut the basement floors to find the sewer, install a new eight-inch pipe, and then clean up the basements. N.T. at 141, R.R. at 204a. This work exceeded the scope of the work set forth in Port Vue's contract with the Authority. *Id.* Perkoski testified that Glenn Engineering was aware of this extra work and agreed that it would be "traded for the other pipe bursting," which was scheduled to be done for a payment of $14,000. N.T. at 143, R.R. at 206a. Perkoski explained:

[t]he remaining pipe bursting that had to be done, which amounted to, if you looking [sic] at the schedule, [$]14,000, and I did eight houses or seven houses, and it had to cost me five to eight thousand at that time.

8

> So I did $35,000 worth of work for $14,000, because [Glenn] is a friend of [mine].

N.T. at 143-44, R.R. 206a-07a.[3]

When asked if he completed the 112 feet of sewer line between manholes 766 and 767, Perkoski stated:

> No. I guess if that's what we say, but that's what we figured that we were going to get extras for the inside, and they didn't have the money for the inside. So we said, okay, we'll leave that existing sewer in and take that money and apply it to each house.

N.T. at 156, R.R. at 219a. When questioned as to whether Port Vue ever supplied the Authority or Glenn with as-built drawings after Port Vue completed the project, Perkoski stated:

> A. Yeah, I drew it with Joe [Dursa] and them on the job the way it was. They knew the way it was. That's how these come up and they're still wrong.
> Q. Did you bring a copy of the as-builts with you?
> A. No. We draw it on paper up at the job.
> Q. You took a piece of paper at the site and said, This is what I did?
> A. Well, they could see what I did, but then they put it wrong. It ain't even right on here.
> Q. Well, they couldn't see that you did not complete the 121 feet that was underground.
> A. Well, we agreed to eliminate it to save money.

---

[3] On cross-examination, Perkoski explained how he arrived at the $14,000 figure. He stated that he decided that "wherever we were at that time, we left that pipe bursting go and said we'll apply that money to bursting these people's houses." N.T. at 189, R.R. at 252a.

9

N.T. at 165, R.R. at 228a. Perkoski acknowledged that the payment application that his company submitted to the Authority indicated that Port Vue had completed 100% of the bursting of the lines from manhole 764 to manhole 767. N.T. at 171, R.R. at 234a.

Following the one-day trial, the trial court entered a verdict in favor of the Authority and awarded it $39,033.69 in damages. Trial Court Opinion at 6. The trial court concluded that "the discovery rule applie[d] to toll the statute of limitations until March of 2012 when the Authority became aware that [Port Vue] failed to complete the work as required by the contract." *Id.* at 4. The trial court also concluded that a 2008 consent order signed by the Authority in a separate case did not bar the instant case. *Id.* at 4-5. Finally, the trial court rejected Port Vue's argument that it could only be held liable for the cost of the work it did not complete in the original contract, which was $14,351.00. *Id.* at 5. Port Vue sought post-trial relief, which was denied. R.R. at 61a. The present appeal followed.

## II. Arguments and Analysis

On appeal,[4] Port Vue raises three arguments. First, it contends that the four-year statute of limitations applicable to breach of contract claims bars the Authority's claims. Second, Port Vue contends that a 2008 consent order between the parties released it from any future claims related to the project. Third, Port Vue contends that the amount of damages awarded to the Authority exceeded what it would have been paid under the contract and, therefore, exceeded those allowed by law.

---

[4] "When reviewing a non-jury verdict, our standard of review is limited to determining whether the competent evidence supports the trial court's findings of fact and whether the trial court committed an error of law." *E. Coast Paving & Sealcoating, Inc. v. N. Allegheny Sch. Dist.*, 111 A.3d 220, 225 n.8 (Pa. Cmwlth. 2015). "This Court must treat the trial court's findings of fact the same as this Court would treat a jury's findings of fact." *Id.* "This Court views the evidence in the light most favorable to the party that prevailed before the trial court." *Id.*

10

In response, the Authority argues that the trial court did not err or abuse its discretion in concluding that the Authority's claim was not barred by the statute of limitations. Next, the Authority argues that this matter is not barred by the consent order because that order involved a separate nucleus of facts and did not release Port Vue from the present claim. Finally, the Authority responds that the trial court did not award damages in excess of those allowed by law because the Authority is entitled to compensation for all damages resulting from Port Vue's failure to fulfill the contract.

This case was originally argued before a panel of three judges of this Court. Subsequently, the Court issued an order directing the parties to file supplemental briefs addressing: (1) "[w]hether a sewer authority may invoke the doctrine of *nullum tempus occurit Regi* ["time does not run against the king"] to defeat an otherwise applicable statute of limitations defense . . ." and whether the Authority "acted in its governmental capacity to enforce an obligation imposed by law[]"; and (2) "[w]hether the statute of limitations begins to run upon occurrence of a breach of contract or upon the discovery of the breach in all types of contracts." Cmwlth. Ct. Order 8/7/18. The matter was then argued before the Court *en banc*.

We will begin by addressing Port Vue's argument that the consent order bars this action because it released Port Vue from any future claims related to the project.

### A. Consent Order

By way of background, in 2005, two property owners along Bevan Road, William Roney and Gina Buzzard, filed suit against multiple parties including Port Vue and the Authority, following land subsidence events behind their homes in 2002 and 2003 related to the sewer line replacement. *See* Trial Court Opinion at 4-

5; Consent Order ¶¶ 1 & 3, R.R. at 23a-24a. The lawsuit was resolved by a settlement agreement, wherein the Authority agreed to release Port Vue from any claim or cause of action related to the litigation. *See* R.R. at 23a-24a. Port Vue contends that, "[b]ut for the contract between [it] and the Authority to perform pipe bursting on the hillside below Bevan Road [it] would not have been involved in the above litigation." Port Vue's Brief at 13.

"In Pennsylvania, a consent decree in an equity action is not considered a legal determination by the courts but is an agreement between the parties." *Penn Township v. Watts*, 618 A.2d 1244, 1247 (Pa. Cmwlth. 1992). "'It is in essence a contract binding the parties thereto.'" *Cecil Township v. Klements*, 821 A.2d 670, 674 (Pa. Cmwlth. 2003) (quoting *Commonwealth v. Rozman*, 309 A.2d 197 (Pa. Cmwlth. 1973)).

The consent order provided that the parties to the agreement, including Port Vue and the Authority, agreed to release and discharge one another from all claims or damages "arising from the slide or land subsidence occurring behind the Roney and Buzzard residences in 2002 and 2003 and including, but not limited to, any claim or cause of action arising out of, or related to, these consolidated litigation matters and it is so ORDERED." Consent Order ¶ 5, R.R. at 24a-25a. Based on this language, the trial court concluded that the release did not apply to the instant case. Trial Court Opinion at 5. We agree.

The Carullis' claim arose because the sewer line between manholes 766 and 767 was not replaced. The 2008 consent order was limited to actions and claims arising from the slide or land subsidence occurring behind the Roney and Buzzard residences. The Carullis were not parties in the prior litigation and did not claim any harm from the 2002 and 2003 land subsidence events behind the Roney and Buzzard

12

residences. Thus, the language of the release does not bar the Authority's breach of contract claim against Port Vue arising from the sewer line not being replaced. Although Port Vue may not have been involved in the prior litigation but for its contract with the Authority, the order released all claims and actions arising from or related to the 2002 and 2003 slide or land subsidence behind the Roney and Buzzard residences. Accordingly, we agree with the trial court that the 2008 consent order does not bar the Authority from bringing its claims against Port Vue in this matter.

## B. Statute of Limitations

With respect to the statute of limitations, Port Vue argues that the Authority's claim is barred because the statute of limitations began to run upon the occurrence of the breach. In response, the Authority argues that it is not subject to any statute of limitations under the doctrine of *nullum tempus*. The Authority also asserts that its claim is not time-barred under the "discovery rule" and that the statute of limitations does not begin until the Authority, exercising reasonable diligence, could have discovered the injury, which it claims was when the damage to the Carullis' basement occurred. Additionally, and in the alternative, the Authority argues that even if it is subject to a statute of limitations defense, Port Vue is estopped from asserting such a defense due to fraudulent concealment.

### (i) Nullum Tempus

We begin with the doctrine of *nullum tempus*. "The doctrine of *nullum tempus* permits a government agency 'to circumvent the applicable statute of limitations.'" *Allegheny Intermediate Unit v. E. Allegheny Sch. Dist.*, 203 A.3d 371, 378 (Pa. Cmwlth. 2019) (quoting *Duquesne Light Co. v. Woodland Hills Sch. Dist.*, 700 A.2d 1038, 1051 (Pa. Cmwlth. 1997)), *petition for allowance of appeal denied*, (Pa., No. 52 WAL 2019, July 24, 2019). "Under the *nullum tempus* doctrine, statutes

13

of limitations do not apply to actions brought by the state and its agencies, unless the statute of limitation expressly provides that it limits the government's right to sue." *Township of Salem v. Miller Penn Dev., LLC*, 142 A.3d 912, 918 (Pa. Cmwlth. 2016). The four-year statute of limitations for contract actions does not expressly provide that it applies to actions brought by government entities. *See* 42 Pa.C.S. § 5525. Therefore, the statute of limitations cannot bar this action if *nullum tempus* applies. *See Township of Salem*, 142 A.3d at 918.

"The *nullum tempus* doctrine does not apply to all suits by local governments, but does extend to local governments where they are enforcing strictly public rights." *Township of Salem*, 142 A.3d at 918. "For the *nullum tempus* doctrine to exempt a municipality from the statute of limitations, the municipality's claims must both 1) accrue to the municipality in its governmental capacity and 2) seek to enforce an obligation imposed by law, as distinguished from one arising out of a voluntary agreement."[5] *Id.* "An action involving a local government contract or agreement is brought in the local government's governmental capacity and seeks

---

[5] We note that Port Vue first asserts that the doctrine of *nullum tempus* does not apply because the Authority is not a Commonwealth party. Port Vue's Supplemental Brief at 1-2. We note that the Authority does not argue that it is a Commonwealth party and does not dispute that this two-prong test is the appropriate test to apply to determine whether *nullum tempus* applies. *See* Authority's Supplemental Brief at 1-2. For purposes of *nullum tempus*, we conclude that the Authority cannot be construed as being a Commonwealth party. *See Se. Pa. Transp. Auth. v. Union Switch & Signal, Inc.*, 637 A.2d 662, 666 (Pa. Cmwlth. 1994) (stating, "[w]hile authorities may be considered an 'instrumentality of the Commonwealth', that does not mean that they are automatically considered to be 'the Commonwealth' for all purposes"). In *Northampton County Area Community College v. Dow Chemical, U.S.A.*, 566 A.2d 591, 596 (Pa. Super. 1989), *aff'd*, 598 A.2d 1288 (Pa. 1991), the Superior Court held that community colleges cannot be construed as Commonwealth parties "because the legislature did not create them but merely authorized their creation by means of an enabling statute[.]" Likewise here, the legislature, via the Municipality Authorities Act (Act), 53 Pa.C.S. §§ 5601-5623, authorized the creation of municipal authorities, but it is the municipality that creates authorities. *See* 53 Pa.C.S. § 5603 (concerning method of incorporation); *Se. Pa. Transp. Auth.*, 637 A.2d at 664 (stating, "authorities owe their existence to the various units of government and their governing boards are appointed by those entities").

to enforce obligations imposed by law where the contract is one that the local government entity was required to enter into as part of its public duties." *Id.* "The requirement that the action be brought in the local government's governmental capacity and seek to enforce obligations imposed by law is likewise satisfied and *nullum tempus* applies where the parties' rights are governed by statute, even though the local government was not required to enter into the contract." *Id.* Thus, for *nullum tempus* to apply, "the right sought to be enforced must be strictly public, as well as imposed by law." *Duquesne Light Co.*, 700 A.2d at 1051.

In *Township of Salem*, this Court applied the doctrine of *nullum tempus*. In that case, the township brought suit against the subdivision developer for breaching the parties' agreement for site improvements and to recover damages for the cost of making the street repairs. *Township of Salem*, 142 A.3d at 916. In concluding that the township's action was not barred by the statute of limitations because of *nullum tempus*, this Court stated:

> the [d]eveloper's [a]greement] and fixing [the street] involve the [t]ownship's duties to its residents. Ensuring the adequate construction of streets is a purely public purpose within a municipality's obligations to its citizens, not a mere voluntary contractual undertaking. *Pocono Township* [*v. Hall*]*,* 561 A.2d [53,] 56 [(Pa. Cmwlth. 1989)]. Indeed, Section 509 of the [Pennsylvania Municipalities Planning Code[6] (MPC)] imposes a duty on municipalities to require that developers complete public improvements in accordance with [subdivision and land development ordinance] requirements. 53 P.S. §10509; *Stivala Investments, Inc. v. South Abington Township Board of Supervisors,* 815 A.2d 1, 5 (Pa. Cmwlth. 2003).

---

[6] Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §§ 10101–11202.

> Moreover, the parties' rights in this action are governed by statute. Section 511 of the MPC imposes on developers the cost of correcting improperly installed improvements. 53 P.S. §10511; *Stivala Investments,* 815 A.2d at 4; *Safford v. Board of Commissioners, Annville Township,* 35 Pa. Cmwlth. 631, 387 A.2d 177, 182 (1978).

*Township of Salem*, 142 A.3d at 918-19.

Similarly, this Court held that the doctrine of *nullum tempus* applied in *Delaware County v. First Union Corporation*, 929 A.2d 1258 (Pa. Cmwlth. 2007), wherein the county brought suit against banks that were the depositories for bonds issued by the county. The banks did not return unclaimed funds within two years to the county as required by the Local Government Unit Debt Act (Debt Act),[7] but rather, after another five years, escheated the unclaimed funds to the Commonwealth pursuant to section 1301.3 of the act commonly known as the Unclaimed Property Act.[8] *Id.* at 1260. This Court held that *nullum tempus* applied, because while the county had the discretion to decide whether to issue the bonds, once the bonds were issued, the parties' rights were controlled by statute, i.e., the Debt Act. *Id.* at 1262.

In contrast, in *Altoona Area School District v. Campbell*, 618 A.2d 1129 (Pa. Cmwlth. 1992), this Court held that a school district could not invoke the doctrine of *nullum tempus* to defeat the statute of limitations in an action for breach of contract and on the related performance bond concerning the construction of a public library. *Id.* at 1134. We noted that although the school district was authorized

---

[7] 53 Pa.C.S. §§ 8001-8049.

[8] Act of April 9, 1929, P.L. 343, *as amended*, added by Section 5 of the Act of December 9, 1982, P.L. 1057, 72 P.S. § 1301.3.

16

to build libraries under section 418 of The Library Code,[9] it was not mandated to do so. *Id.* at 1132. Therefore, we reasoned that the school district was not obligated by law to enter into a contract to construct the library, but rather, entered into the contract voluntarily as it was authorized to do under The Library Code. *Id.* at 1132-33. Accordingly, we concluded that the school district was not seeking to enforce strictly public rights, and therefore, *nullum tempus* did not apply. *Id.* at 1134.

Here, Port Vue argues that *nullum tempus* does not apply because there is no statutory duty or obligation to provide sewer service. The Authority, on the other hand, argues that it was created pursuant to the Municipality Authorities Act (Act) for the sole purpose of extending the public right of sewer services to Township residents, and the Authority is the governmental arm through which the Township acts in its governmental capacity. Authority's Supplemental Brief at 2. Further, the Authority argues that once a sewer service exists, the Authority has a duty, or legal obligation, to continue to provide those services and keep them in good repair. *Id.* at 3.

The Act defines an authority as "[a] body politic and corporate created under this chapter[.]" 53 Pa.C.S. § 5602. The Act authorizes the creation of an authority for:

> **(a) Scope of projects permitted.**—Every authority incorporated under this chapter shall be a body corporate and politic and shall be for the purposes of financing working capital; acquiring, holding, constructing, financing, improving, maintaining and operating, owning or leasing, either in the capacity of lessor or lessee,

---

[9] Act of June 14, 1961, P.L. 324, *as amended*, *formerly* 24 P.S. § 4418, repealed by Act of November 1, 2012, P.L. 1683.

projects of the following kind and character and providing financing for insurance reserves:

. . .

(5) Sewers, sewer systems or parts thereof.

53 Pa.C.S. § 5607(a)(5). Further, the Act states that an authority "*may* exercise all powers necessary or convenient for the carrying out of the[se] purposes . . . ." 53 Pa.C.S. § 5607(d) (emphasis added).

Thus, the Act only *authorizes* the creation of the Authority for the purpose of, *inter alia*, improving and maintaining sewers or sewer system projects; the Act does not mandate such. The Authority argues, however, that this is of no consequence; rather, the Authority contends that it is mandated to continue the provision of such services and that this mandate is important and what distinguishes this case from *Altoona*. Authority's Supplemental Brief at 2-3. The Authority argues that once it undertakes a sewer system, it has a duty to maintain it. While we agree with the Authority that once it undertakes a sewer system, it has a duty to maintain it, there is no *statutory* duty. The Act does not control the terms of any contract between a contractor and an authority relating to the sewer or sewer system or the maintenance thereof. Rather, the duty the Authority forwards is no different than the common law duty of care. This duty is unlike the statutory duty in *Township of Salem*, where the parties' contractual terms were governed by the township's subdivision and land development ordinance, and unlike *Delaware County*, where the Debt Act governed the parties' rights. Thus, the Authority's claims do not accrue to it in its governmental capacity and do not seek to enforce an obligation imposed by law. In sum, unlike the case of *Township of Salem* and similar to the case of *Altoona*, here, the parties' obligations are not imposed by statutory law but are dictated solely by the actual terms of the contract. Accordingly, the doctrine of

18

*nullum tempus* does not apply, and therefore, the statute of limitations applies to this action.

### (ii)     Whether the statute of limitations begins to run upon the occurrence of the breach or upon the discovery of the injury

Port Vue argues that the statute of limitations begins to run upon the occurrence of the breach.  The Authority, on the other hand, argues the discovery rule applies, pursuant to which the statute of limitations does not begin to run until a party, using reasonable diligence, discovers the breach.  Authority's Supplemental Brief at 4-5.  The trial court applied the discovery rule.

The Supreme Court of the United States observed:

> Statutes of limitation are vital to the welfare of society and are favored in the law. They are found and approved in all systems of enlightened jurisprudence. They promote repose by giving security and stability to human affairs. An important public policy lies at their foundation. They stimulate to activity and punish negligence. While time is constantly destroying the evidence of rights, they supply its place by a presumption which renders proof unnecessary. Mere delay, extending to the limit prescribed, is itself a conclusive bar.

*Wood v. Carpenter*, 101 U.S. 135, 139 (1879).

In Pennsylvania, our courts have noted that, generally, "[s]tatutes of limitations 'are designed to effectuate three purposes: (1) preservation of evidence; (2) the right of potential defendants to repose; and (3) administrative efficiency and convenience.'"  *Lesoon v. Metro. Life Ins. Co.*, 898 A.2d 620, 626-27 (Pa. Super. 2006) (quoting *Kingston Coal Co. v. Felton Mining Co.*, 690 A.2d 284, 288 (Pa. Super. 1987)).  "Whether a complaint is timely filed within the limitations period is

19

a matter of law for the court to determine." *Crouse v. Cyclops Indus.*, 745 A.2d 606, 611 (Pa. 2000).

Section 5502 of the Judicial Code sets forth the method of computing periods of limitation and provides:

> The time within which a matter must be commenced under this chapter shall be computed, except as otherwise provided by subsection (b) or by any other provision of this chapter, *from the time the cause of action accrued*, the criminal offense was committed or the right of appeal arose.

42 Pa.C.S. § 5502(a) (emphasis added). Our Supreme Court has stated, "[i]n construing this language for general contract purposes, we have adopted the view of a majority of jurisdictions that it is the accrual of the right of action that starts a limitations period to run." *Erie Ins. Exch. v. Bristol*, 174 A.3d 578, 585 (Pa. 2017). Our Supreme Court noted that this view is "in accord with the law across the country[,]" which provides:

> *Unless a statute provides otherwise, the statute of limitations begins to run at the time when a complete cause or right of action accrues or arises, which occurs as soon as the right to institute and maintain a suit arises.*
>
> The general rule, as embodied in most statutes, is that, unless a statute specifically provides otherwise, as, for example, a statute specifically providing that the statute of limitations shall run from a particular event which may precede the time where the liability actually arises, the statute of limitations begins to run at the time when a complete cause or right of action accrues or arises, and only at such time, that is, as soon as the right to institute and maintain a suit arises, or when there is a demand capable of present enforcement. An action may accrue at

20

the time of a wrongful act, although the limitations period does not always begin on the date the wrong is committed.

54 C.J.S. Limitations of Actions, § 81 (footnotes and case citations omitted.)

*Erie Ins. Exch.*, 174 A.3d at 585-86 (citing *Ctr. Concrete Co. v. AGI, Inc.*, 559 A.2d 516, 518-19 (Pa. 1989)) (emphasis in original).[10]  "In general, for a claim based upon contract, the cause of action accrues and the statute of limitations begins to run on the date that the contract is breached." *GAI Consultants, Inc. v. Homestead Borough*, 120 A.3d 417, 423-24 (Pa. Cmwlth. 2015) (citing *McGaffic v. City of New Castle*, 973 A.2d 1047, 1052 (Pa. Cmwlth. 2009)).  Therefore, applying contract principles to the Authority's breach of contract claim at issue here, the statute of limitations would begin to run when the Authority's cause of action accrued, i.e., when Port Vue breached its duty under the agreement.  The trial court, however, applied the discovery rule.  We therefore consider whether grounds exist to deviate from the general rule concerning the statute of limitations in a breach of contract action and whether the application of the discovery rule to such breach of contract claim is appropriate.

With respect to the statute of limitations and the discovery rule, our Supreme Court has stated:

---

[10] In *Erie Insurance Exchange*, our Supreme Court considered when the statute of limitations begins to run when an insurer is alleged to have breached its duty under an insurance contract involving a claim for uninsured motorist coverage. *Erie Ins. Exch.*, 174 A.3d at 579.  The case did not involve the discovery rule.  Nonetheless, the relevance of this decision to the case before us is that our Supreme Court emphasized that the controlling law for determining when the limitations period begins to run for a breach of contract action is when the cause of action accrued. *Id.* at 585-86.  Further, the Court concluded that because there was no compelling public policy ground or legislative intent in the related motor vehicle statute, there was no reason to create a special rule for when the statute of limitations begins to run in an uninsured motorist case. *Id.* at 589.

21

As a matter of general rule, a party asserting a cause of action is under a duty to use all reasonable diligence to be properly informed of the facts and circumstances upon which a potential right of recovery is based and to institute suit within the prescribed statutory period. . . . Thus, the statute of limitations begins to run as soon as the right to institute and maintain a suit arises; lack of knowledge, mistake or misunderstanding do not toll the running of the statute of limitations . . . ; even though a person may not discover his injury until it is too late to take advantage of the appropriate remedy, this is incident to a law arbitrarily making legal remedies contingent on mere lapse of time. Once the prescribed statutory period has expired, the party is barred from bringing suit unless it is established that an exception to the general rule applies which acts to toll the running of the statute.

The "discovery rule" is such an exception, and arises from the *inability* of the injured, *despite the exercise of due diligence,* to know of the injury or its cause. . . . The salient point giving rise to the equitable application of the exception of the discovery rule is the inability, despite the exercise of diligence by the plaintiff, to know of the injury.

*Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983) (emphasis in original) (citations omitted).  The discovery rule is a "judicially created device[.]" *Gustine Uniontown Assocs., Ltd. v. Anthony Crane Rental, Inc.*, 842 A.2d 334, 334 n.8 (Pa. 2004) (*Gustine I*).

"The discovery rule . . . was first used in the limited area of medical malpractice and soon spread to other tort fields."  33 A.L.R.5th 1 (originally published in 1995); *see, e.g., Gleason v. Borough of Moosic*, 15 A.3d 479 (Pa. 2011) (applying discovery rule in action alleging negligent road construction); *Hidden Creek, L.P. v. Lower Salford Twp. Auth.*, 129 A.3d 602 (Pa. Cmwlth. 2015) (applying discovery rule in action that alleged authority's charges for sewer tapping

22

fees violated Act and noting similarity of claim to that in *Harleysville Homestead, Inc. v. Lower Salford Township Authority*, 980 A.2d 749 (Pa. Cmwlth. 2009), a claim that was held to sound in tort); *Garvey v. Rosanelli*, 601 A.2d 1334 (Pa. Cmwlth. 1992) (applying discovery rule in negligence action alleging latent defects in residential construction).

Pennsylvania courts have also considered the application of the discovery rule to non-tort actions. *See, e.g., Altoona*, 618 A.2d at 1135 (Pa. Cmwlth. 1992) (stating that Section 5523 of Judicial Code, 42 Pa.C.S. § 5523, is a statute of limitations and, therefore, cause of action on performance bond brought pursuant to that section is subject to discovery rule)[11]; *Amodeo v. Ryan Homes, Inc.*, 595 A.2d 1232 (Pa. Super. 1991) (holding that discovery rule applied to breach of implied

_____

[11] In *Altoona*, this Court held that a school district's claims against the contractor and surety based on the performance bond raised genuine issues of fact as to when the statute of limitations began to run, and that because Section 5523 of the Judicial Code— which states that an action upon any payment or performance bond must be commenced within one year— is a statute of limitations, rather than a statute of repose, the claim was subject to the discovery rule. *Altoona Area Sch. Dist.*, 618 A.2d at 1135. That case does not mandate applying the discovery rule here, as it is distinguishable given the role of the entity seeking to enforce the performance bond. An action asserting a claim based on a performance bond is not a breach of contract action per se and is *sui generis*. A performance bond is "[a] bond given by a surety to ensure the timely performance of [the terms of] a contract." Performance Bond, Black's Law Dictionary 1319 (10th ed. 2014). Under a performance bond, a third party, usually known as a surety, agrees to guarantee the completion of a construction contract. *See id.* The contractor purchases the performance bond from the surety to ensure the contractor's performance of the construction contract for the benefit of the named obligee (e.g., the property owner who is a party to the underlying construction contract), which in *Altoona* was the school district. *See* Philip L. Bruner & Patrick J. O'Connor, Jr., 4A Bruner & O'Connor on Construction Law § 12:32 (June 2018) (stating that purpose of performance bond is to protect named obligee against contractor's default in completion of underlying contract). Notably, the obligee, the entity seeking to enforce the performance bond, is not involved in the creation/procurement of the performance bond and does not provide consideration (or payment) for the performance bond. In other words, that entity is essentially a third-party beneficiary and is not a negotiating party at arms' length. When determining liability of the surety under the performance bond, the terms of the bond instrument control, not the underlying contractor agreement. 20 Standard Pa. Practice 2d § 108:18 (June 2019).

warranty of habitability claims involving defective construction). The Pennsylvania Superior Court has stated, "[t]he discovery rule in Pennsylvania applies to all causes of action, including breach of contract." *Morgan v. Petroleum Prods. Equip. Co.*, 92 A.3d 823, 828 (Pa. Super. 2014) (citing *Sadtler v. Jackson-Cross Co.*, 587 A.2d 727, 731 (Pa. Super. 1991)) and applying discovery rule to breach of contract claim); *Sadtler* (applying discovery rule to breach of contract case in which purchasers of real estate brought suit against their appraiser).[12] *Compare Gustine Uniontown Assocs., Ltd., ex rel. Gustine Uniontown, Inc. v. Anthony Crane Rental, Inc.*, 892 A.2d 830, 836 (Pa. Super. 2006) (*Gustine II*) (holding that contract language, which stated that "applicable statute of limitations shall commence to run" not later than the date of substantial completion, precluded application of discovery rule).

Our Supreme Court, however, has not pronounced the applicability of the discovery rule to a breach of contract action based on an express written contract negotiated at arms' length. In *Crouse*, our Supreme Court affirmed the Superior Court's application of the discovery rule to a claim based on promissory estoppel, a doctrine which, while sounding in contract law, "makes otherwise unenforceable agreements binding," *id.* at 610, and, thus, is not based on an express written negotiated term.[13] Notably, in his concurring and dissenting opinion, Justice Saylor stated:

---

[12] Although the plaintiffs in *Sadtler* alleged negligent performance of an agreement to appraise real estate, the Superior Court held that the action was a breach of contract action because the appraiser owed no duties to the plaintiffs except those imposed by the appraisal agreement. *Sadtler*, 587 A.2d at 731.

[13] "For example, the doctrine allows a party to enforce a promise that is not supported by consideration." *Peluso v. Kistner*, 970 A.2d 530, 532 (Pa. Cmwlth. 2009) (citing *Crouse*, 745 A.2d at 610). Promissory estoppel is also referred to as detrimental reliance. *Id.*

24

I also question whether the discovery rule should apply to a claim based upon promissory estoppel. Although the discovery rule, which evolved in the tort context, has been applied by Pennsylvania courts in some discrete categories of cases involving contractual or quasi-contractual claims, *see, e.g., Amodeo v. Ryan Homes, Inc.,* 407 Pa. Super. 448, 453-54, 595 A.2d 1232, 1235 [1991] (stating that "the discovery rule does apply to cases involving defective construction"), *its use has not been adopted on a wholesale basis in this area*, and, notably, other jurisdictions are divided as to its applicability. *Compare Morris v. Fauver,* 153 N.J. 80, 707 A.2d 958, 972 (1998)("the rationale for employing the discovery rule in tort- or fraud-type actions . . . does not carry over to most contract actions, and therefore, the discovery rule has not been applied in such suits"); *CLL Assoc*[*s.*] *Ltd. v. Arrowhead Pacific Corp.,* 174 Wis.2d 604, 497 N.W.2d 115, 117 (1993)("[i]n the context of general contract law, public policy favors the current rule that the contract statute of limitations begins to run at the time of breach"), *with Heron Financial Corp. v. United States Testing Co.,* 926 S.W.2d 329, 332 (Tex. App. 1996)("a discovery rule analysis applies to both tort and contract actions alike").

*Crouse*, 745 A.2d at 613 n.1 (Saylor, J., concurring and dissenting) (emphasis added).

Subsequent to Justice Saylor's statement above, this Court issued an unreported decision in *Ruddy v. Mt. Penn Borough Municipal Authority* (Pa. Cmwlth., Nos. 1120 C.D. 2013 & 1200 C.D. 2013, filed May 6, 2014), in which we applied the discovery rule to a claim for unjust enrichment. In doing so, however, the Court noted, among other things, that the situation was not one "where the damages were based on an actual contract, but instead, on the quasi-contractual and equitable doctrine of unjust enrichment." *Id.*, slip op. at 6.

25

As pointed out by Justice Saylor in *Crouse*, states are split as to the applicability of the discovery rule in breach of contract actions. For example, in Wisconsin, the discovery rule does not apply to actions for breach of contract. *CLL Assocs. Ltd.* The Wisconsin Supreme Court stated that although it applies the discovery rule to tort cases, it would not extend the doctrine to breach of contract actions because, "unlike in tort law, the need to protect defendants from stale or fraudulent claims outweighs any injustice caused by barring rights of action prior to discovery." *Id.* at 118. In so holding, the court relied on two critical differences between tort and contract claims. *Id.* The first stemmed from the availability of liability insurance in tort law, whereas, "[i]n contrast, contract law, which deals primarily with the enforcement of private promises, has nothing comparable to liability insurance." *Id.* The second difference was that, unlike a potential tort claimant, "a contract claimant often has a significant amount of control over its risk of loss." *Id.* The court noted, for example that the parties had choices regarding what materials to use, inspections, warranties, price adjustments, etc., and that such "increased ability of potential contract claimants to protect themselves in the first instance lessens the need to provide them an opportunity for legal redress."[14] *Id.*

Likewise, in New York, the discovery rule does not apply to breach of contract actions because

> [the state's] statutes of limitation serve the same objectives
> of finality, certainty and predictability that New York's
> contract law endorses. Statutes of limitation not only save

---

[14] The Wisconsin Supreme Court noted that, to the extent its holding "creates unjust results in specific situations not now before this court, *i.e.*[,] in the consumer context where contracting consumers have limited bargaining power, the legislature, with its greater resources for weighing policy, is best equipped to enact specific ameliorative laws." *CLL Assocs. Ltd.*, 497 N.W.2d at 119.

26

litigants from defending stale claims, but also "express[ ] a societal interest or public policy of giving repose to human affairs" . . . . And we have repeatedly "rejected accrual dates which cannot be ascertained with any degree of certainty, in favor of a bright line approach" . . . .

Accordingly, New York does not apply the "discovery" rule to statutes of limitations in contract actions . . . . Rather, the "statutory period of limitations begins to run from the time when liability for wrong has arisen even though the injured party may be ignorant of the existence of the wrong or injury" . . . . This is so even though the result may at times be "harsh and manifestly unfair, and creates an obvious injustice" because a contrary rule "would be entirely dependent on the subjective equitable variations of different [j]udges and courts instead of the objective, reliable, predictable and relatively definitive rules that have long governed this aspect of commercial repose" . . . . Indeed, "[t]o extend the highly exceptional discovery notion to general breach of contract actions would effectively eviscerate the [s]tatute of [l]imitations in this commercial dispute arena" . . . .

*ACE Sec. Corp. v. DB Structured Prods., Inc.*, 36 N.E.3d 623, 627-28 (N.Y. 2015) (internal citations omitted).

Similarly, in holding that the discovery rule did not apply to a breach of contract action for failure to follow payment provisions of a contract, the New Jersey Supreme Court explained:

[a]lthough it seems "inequitable that an injured person, unaware that he has a cause of action, should be denied his day in court solely because of his ignorance, if he is otherwise blameless," it may also be "unjust, however, to compel a person to defend a law suit long after the alleged injury has occurred, when memories have faded, witnesses have died and evidence has been lost." . . .

27

Although some negligence or malpractice actions involve inherently undiscoverable types of injuries, *most contract actions presume that the parties to a contract know the terms of their agreement and a breach is generally obvious and detectable with any reasonable diligence.* Because the discovery rule imposes on plaintiffs an affirmative duty to use reasonable diligence to investigate a potential cause of action, and thus bars from recovery plaintiffs who had "reason to know" of their injuries, the discovery rule generally does not apply to contract actions.

*County of Morris v. Fauver*, 707 A.2d 958, 972-73 (N.J. 1998) (emphasis added) (citations omitted).

Where the discovery rule has been applied in other jurisdictions, courts have done so because it would be unjust to deprive plaintiffs of a cause of action before they are aware of an injury. For example, in California:

the discovery rule applies to unique breach of contract cases when: 1) "[t]he injury or the act causing the injury, or both, have been difficult for the plaintiff to detect"; 2) "the defendant has been in a far superior position to comprehend the act and the injury"; or 3) "the defendant had reason to believe the plaintiff remained ignorant [that] he had been wronged." [*April Enters., Inc. v. KTTV and Metromedia, Inc.*, 195 Cal.Rptr. 421, 436 (Cal. Ct. App. 1983)]. The rationale underlying application of the discovery rule is that "plaintiffs should not suffer where circumstances prevent them from knowing they have been harmed . . . [and] defendants should not be allowed to knowingly profit from their injuree's ignorance." *Id.*

*El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032, 1039 (9th Cir. 2003).

In Arizona, the Supreme Court held that the discovery rule can apply to breach of contract actions because "the important inquiry in applying the discovery

28

rule is whether the plaintiff's injury or the conduct causing the injury is difficult for plaintiff to detect, not whether the action sounds in contract or in tort." *Gust, Rosenfeld & Henderson v. Prudential Ins. Co. of Am.*, 898 P.2d 964, 968 (Ariz. 1995).

One commentator in discussing the discovery rule and computing a limitations period from "when a cause of action accrues" noted the division, i.e., the statutory period may begin either when the defendant commits the wrong or when the plaintiff is injured. Marc M. Schneier, Esq., 28 No. 2 Constr. Litig. Rep. 10 (Feb. 2007). He explained:

> This division is fundamental to the distinction between contract and tort: a contract action may be brought immediately upon breach, whereas a tort action cannot be brought until the plaintiff suffers appreciable injury. The reason for this distinction is that, immediately upon material breach, a contract plaintiff is entitled to at least nominal damages; however, a negligent defendant is liable to no one until he or she causes injury. See 18 Samuel Williston, *Williston on Contracts* § 2021A at 698 (3d ed. 1978); 51 Am.Jur.2d *Limitations of Actions* §§ 160 & 167 (2000) (contract and tort, respectively); and 54 C.J.S. *Limitations of Actions* §§ 163 & 193 (2005) (contract and tort, respectively); accord, *Travis Pruitt & Assocs., P. C. v. Bowling*, 238 Ga.App. 225, 518 S.E.2d 453 (1999), 20 CLR 340 (1999).

Schneier, 28 No. 2 Constr. Litig. Rep. 10.

This distinction is significant. In a breach of contract action such as here, the injury is the failure to perform or, in other words, the breach. *See Freedom Oil Works Co. v. Williams*, 152 A. 741, 743 (Pa. 1930) (holding that where defendant admitted there was a breach of contract, plaintiffs were entitled at least to nominal

damages); *Wolfe v. Allstate Prop. & Cas. Ins. Co.*, 790 F.3d 487, 497 (3d Cir. 2015) (stating, "[u]nder Pennsylvania law, if a plaintiff is able to prove a breach of contract but can show no damages flowing from the breach, the plaintiff is nonetheless entitled to recover nominal damages").

In sum, we are faced with the binding precedent of this Commonwealth wherein the discovery rule has been extended from the tort context to breach of implied warranty actions and quasi-contractual matters of promissory estoppel and unjust enrichment. *See supra* pp. 22-25. However, our Supreme Court has neither expressed a blanket prohibition nor has it applied the discovery rule— a judicially created doctrine— to a breach of contract action where a party is seeking to enforce an express written contract that the party negotiated. Further, although the Superior Court has applied the discovery rule to a breach of contract action, its decisions are not controlling authority for this Court. Additionally, as noted by Justice Saylor, other jurisdictions are split on the application of the discovery rule in a breach of contract action.

We are mindful that the controlling law for determining when the limitations period begins to run for a breach of contract action is when the cause of action accrued, i.e., upon the occurrence of the breach. *See* 42 Pa.C.S. § 5502(a); *Erie Ins. Exch.*, 174 A.3d at 585-86; *GAI Consultants*, 120 A.3d at 423-24. Further, we are mindful that the discovery rule is a judicially created doctrine with equitable application. The Authority has not forwarded any compelling inequities as a reason to create a special rule as to when the statute of limitations begins to run in a breach of contract action based on an express written negotiated contract. The mere fact that a municipality is involved is not a sufficiently compelling ground. Because our Supreme Court has not extended the discovery rule, a judicially created equitable

30

doctrine, to the arena of breach of contract actions involving express written negotiated contracts,[15] we decline to do so.

In declining to extend the discovery rule to breach of contract actions based on an express written negotiated contract in the absence of precedent from our Supreme Court, we note that the parties to a contract are not without recourse and, thus, equity does not demand a contrary result. As the Wisconsin Supreme Court reasoned when it refused to apply the discovery rule to a breach of contract action, "a contract claimant often has a significant amount of control over its risk of loss." *CLL Assocs. Ltd.*, 497 N.W.2d at 118.

The parties here had choices over the material to use and the inspection procedures, and they specified those in the agreement.[16] *See* Bid, Div. IX,

---

[15] We note the case of *Gustine I* in which the owners of a shopping mall sued the architectural contractor, as well as others, for, *inter alia*, breach of contract, asserting claims arising out of a written construction contract. *Gustine I*, 842 A.2d at 338-39. Notably, the only issue before our Supreme Court was whether the breach of contract claim was subject to the Judicial Code's four-year or six-year statute of limitations period. *Id.* at 338. Although the appellants, in arguing for a longer limitations period, stated that Pennsylvania recognizes the discovery rule in breach of contract actions, *id.* at 344, the Court did not mention whether the appellants cited any authority in support of such claim, and the Court's note appended to that statement only cites *Crouse* relative to the discovery rule. *See id.* at 344 n.8. As discussed, *supra*, *Crouse* asserted a claim based on the quasi-contractual theory of promissory estoppel, not a breach of contract claim based on a written contract.

In *Gustine I*, on remand to the Superior Court, the court held that the contract language (stating that the "applicable statute of limitations shall commence to run" not later than the date of substantial completion) precluded application of the discovery rule. *Gustine II*, 892 A.2d at 836.

[16] The agreement states that the "Contract Documents form the Contract for construction." Div. II, Information to Bidders, art. I- Definitions (.14), R.R. at 303a. The "Contract Documents" consist of the following:

> the Owner-Contractor Articles of Agreement, The Contract Provisions, Information to Bidders, Legal Section, Proposal and Bidding Sheets, Scope of Work, Statement of Bidders Qualifications, Engineering Specifications (General and Detail), Plans as defined in the Scope of Work, Schedule of Drawings, and

31

Engineering Specifications, R.R. at 408a-85a. For example, the contract provided that the engineer would be the Authority's representative during construction until final payment is due. Bid, Div. VI, Contract Provisions, art. 1, § 1.01(.2); R.R. at 353a. The contract further provided that the engineer would visit the site at appropriate intervals to become familiar with the progress and quality of work. *Id.* at § 1.01(.4); R.R. at 353a. The contract further required Port Vue to have copies of the contract documents and an additional set of plans at the work site for use by the engineer and the Authority, and provided for observation of the work at all times by the engineer and the Authority. *Id.* at § 1.01(.4-.5); R.R. at 353a; *see also* Bid, Div. VI, Contract Provisions, art. 3, § 3.11(.1); R.R. at 366a.

We recognize that despite Glenn's acknowledgement that the work could have been visually inspected at any time by climbing down the manhole with a flashlight, N.T. at 56, R.R. at 119a, the trial court found that "technology for video inspection of the work was not readily available at the time and physical inspection of the work after it was completed was not possible due to the subsurface nature of the project." Trial Court Opinion at 4. However, parties to a contract have choices over inspection procedures and can negotiate those in advance. That was done here using various procedures that were available to the parties at the time. Indeed, the bid specifications for the project set forth documents that Port Vue would be responsible for providing upon completion of the project and expressly required, among other things:

> shall include the Public Advertisement, Addenda (if any), Change Orders, as issued, Notice of Award, Notice to Proceed, all Bonds and Insurance as defined elsewhere, and the Federal Guideline Requirements, if applicable.

Div. II, Information to Bidders, art. 1, Definitions (.15), R.R. at 304a.

**"Record" or "As-Built" Drawings**

> 01. The Contractor shall be responsible for supplying a clean and legible set of final drawings clearly showing the final position of all equipment or materials used in construction of the project. This set of drawings must be turned over to the Engineer and approved by the Owner before the final payment is released on the project. This drawing must be on the same data set as the existing drawing and a CAD.dwg file of the manholes supplied.

Bid, Div. V, Scope of Work, Part 4.00, § 4.04(.01); R.R. at 345a. The contract also provided for the engineer to conduct reviews to determine final completion. Bid, Div. VI, Contract Provisions, art. 1, § 1.06(.2); R.R. at 356a. Port Vue also agreed under the contract to make repairs for a period of 18 months after the date of completion and to deliver a bond to the Authority to ensure completion. Bid, Div. VI, Contract Provisions, art. 3, § 3.06(.14); R.R. at 364a; *see id.* at § 3.18(.2); R.R. at 370a. The Authority does not argue, nor does it point to any contract provision, that purportedly provides for a statute of limitations period longer than the four years allowed by law upon the occurrence of a breach. This "increased ability of potential contract claimants to protect themselves in the first instance lessens the need to provide them an opportunity for legal redress." *CLL Assocs. Ltd.*, 497 N.W.2d at 118. Further, from a practical equitable perspective, to apply the discovery rule to the situation here would leave contractors with prolonged and open-ended liability and an unwillingness to contract with municipalities given an open-ended exposure period.

Because we decline to extend the discovery rule to this breach of contract action based on an express written negotiated contract in the absence of Pennsylvania Supreme Court precedent doing so, we conclude that the trial court erred as a matter of law in applying the discovery rule to the Authority's breach of

33

contract claim and, therefore, in concluding that the complaint was timely. *See Crouse*, 745 A.2d at 611 (stating whether a complaint is timely filed is a matter of law). Nonetheless, we must address the Authority's alternative argument that Port Vue is estopped from asserting the statute of limitations as a defense under the doctrine of fraudulent concealment.

### *(iii)* *Fraudulent concealment*

> The discovery rule is distinct from the issue of whether a party is equitably estopped from invoking the statute of limitations. *Fine v. Checcio*, 582 Pa. 253, 870 A.2d 850 (2005). The discovery rule operates to toll the statute of limitations during the period the plaintiff's injury or its cause was neither known nor reasonably knowable to the plaintiff. *Id.* The separate doctrine of fraudulent concealment tolls the statute based on an estoppel theory and provides that a defendant may not invoke the statute of limitations if through either intentional or unintentional fraud or concealment, the defendant causes the plaintiff to relax his vigilance or deviate from his duty of inquiry into the facts. *Id.* Thus, the former doctrine involves a plaintiff's lack of knowledge and the latter doctrine pertains to a defendant's conduct after the cause of action arose.

*Gustine II*, 892 A.2d at 835 n.2.

The doctrine of fraudulent concealment is rooted in equity. 4 West's Pa. Prac., Torts: Law and Advocacy § 17.6 (November 2018) (citing *Nesbitt v. Erie Coach Co.*, 204 A.2d 473, 476 (Pa. 1964)). Our Supreme Court has explained that "[t]he doctrine does not require fraud in the strictest sense encompassing an intent to deceive, but rather, fraud in the broadest sense, which includes an unintentional deception." *Fine*, 870 A.2d at 860 (citing *Deemer v. Weaver*, 187 A. 215 (Pa. 1936)). "The plaintiff has the burden of proving fraudulent concealment by clear, precise,

34

and convincing evidence." *Id.* "Mistake, misunderstanding or lack of knowledge in themselves do not toll the running of the statute of limitations." *Id.* at 857. "While it is for the court to determine whether an estoppel results from established facts, it is for the jury [or judge sitting as the factfinder] to say whether the remarks that are alleged to constitute the fraud or concealment were made." *Id.* at 860 (citing *Nesbitt*, 204 A.2d at 476).

The trial court never addressed the Authority's argument regarding fraudulent concealment, presumably because it was not necessary to do so given the trial court's determination that the discovery rule applied to toll the statute of limitations.[17] Our ruling, however, makes it necessary to reach this issue. Because factual determinations are necessary, we must remand this matter to the trial court to address this issue.

Accordingly, we vacate the trial court's order and remand the matter to the trial court to issue a new decision determining whether Port Vue is estopped from asserting the statute of limitations as a defense to the Authority's claim under the doctrine of fraudulent concealment.[18]

_____
CHRISTINE FIZZANO CANNON, Judge

---

[17] We note the Authority raised the issue of fraudulent concealment before the trial court. *See* Authority's Complaint ¶ 18, 20; Authority's Brief in Opposition of Port Vue's Motion for Post-Trial Relief, R.R. at 53a-54a.

[18] Because of our disposition, we do not reach the issue of whether the damages awarded to the Authority exceeded those allowed by law.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Carmen Carulli and Barbara : 
Carulli, husband and wife : 
 : 
      v. : 
 : 
North Versailles Township : 
Sanitary Authority : 
 : 
      v. : 
 : 
Port Vue Plumbing, Inc., :   No. 751 C.D. 2017 
           Appellant : 

# O R D E R

AND NOW, this 13th day of August, 2019, the order of the Allegheny County Court of Common Pleas (trial court) is VACATED and the matter is REMANDED to the trial court to issue a new decision in accordance with the foregoing opinion.

Jurisdiction relinquished.

_____
CHRISTINE FIZZANO CANNON, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Carmen Carulli and Barbara Carulli,    :
husband and wife    :
    :
    v.    :
    :
North Versailles Township Sanitary    :
Authority    :
    :   No. 751 C.D. 2017
    v.    :
    :   Argued: October 17, 2018
Port Vue Plumbing, Inc.,    :
    Appellant    :


BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
           HONORABLE RENÉE COHN JUBELIRER, Judge
           HONORABLE P. KEVIN BROBSON, Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE ANNE E. COVEY, Judge
           HONORABLE CHRISTINE FIZZANO CANNON, Judge
           HONORABLE ELLEN CEISLER, Judge


DISSENTING OPINION
BY JUDGE McCULLOUGH           FILED: August 13, 2019

I dissent respectfully, yet earnestly, from the Majority's conclusions that the Allegheny County Court of Common Pleas (trial court) erred in applying the discovery rule—or, more precisely, that the discovery rule does not apply in this case—and that a remand is required in order for the trial court to address the issue of whether the statute of limitations (SOL) was tolled under the doctrine of fraudulent concealment. To me, both of these conclusions are unnecessary and unwarranted.

First, in my view, a remand to the trial court would be entirely redundant because the trial court already issued the factual findings necessary for this Court to readily conclude that Port Vue Plumbing, Inc. (PVP) engaged in conduct that amounted to fraudulent concealment. Specifically, as found by the trial court, PVP made an affirmative misrepresentation to North Versailles Township Sanitary Authority (Authority) that it performed the contract and replaced the sewer lines, and the Authority relied on that misrepresentation and was unable to discover the non-performance through the exercise of reasonable diligence.[1] Under long-standing precedent, these facts are sufficient to establish

---

[1] In its opinion, the trial court found and determined that the SOL was tolled until the point in time in which,

> The Authority became aware that PVP failed to complete the work as required by the contract. PVP contracted with the Authority to complete the entire project. On all occasions PVP represented to the Authority that all work required under the contract was completed. The Authority relied on PVP's representation that all work had been completed because technology for video inspection of the work was not readily available at the time and physical inspection of the work after it was completed was not possible due to the subsurface nature of the project. Testimony was provided at trial that conducting a video inspection of a newly installed sewer line was not a standard practice at the time. Without such special equipment, inspection of the site was limited to surface conditions and there was no indication that PVP had not completed the work or that there was a problem with the work. PVP was fully qualified to complete the work, had performed work for the Authority on prior occasions, and continually informed representatives of the Authority that the work was being completed. In light of the circumstances, it was reasonable for the Authority to rely on the representations of PVP that all work had been completed.
>
> There was nothing to put the Authority on notice that the work may not have been completed until [the date on which] the

**(Footnote continued on next page…)**

PAM – 2

fraudulent concealment and toll the applicable SOL as a matter of law. *See, e.g.*, *Nesbitt v. Erie Coach Co.*, 204 A.2d 473, 477 (Pa. 1964) (concluding that the SOL was tolled via fraudulent concealment where "the agents of the defendant misled the plaintiff into believing" that a set a circumstances existed and "lulled her into a sense of false security"); *cf. Toy v. Metropolitan Life Ins. Co.*, 928 A.2d 186, 207 (Pa. 2007) (stating that "the recipient of an allegedly fraudulent misrepresentation is under no duty to investigate its falsity in order to justifiably rely").[2]

Second, while fraudulent concealment requires a showing of at least unintentional deception, *Nesbitt*, 204 A.2d at 477, be it a misrepresentation or concealment, on the part of a defendant, the discovery rule does not. Instead, as the Majority acknowledges, the discovery rule is a distinct legal principle that focuses upon a plaintiff's lack of knowledge with respect to his/her injury or its cause. *See Fine v. Checcio*, 870 A.2d 850, 857-61 (Pa. 2005); *Nesbitt*, 204 A.2d

---

**(continued…)**

> Authority was notified that the basement of a house along Bevan Road was flooded with raw sewage. Upon such occurrence, the Authority acted with reasonable diligence to inspect the line and it was then that the Authority discovered the failure of PVP to complete the work. For the aforementioned reasons, the Authority's claims are not time barred.

Trial court op. at 4. Notably, although the trial court did not use the words "fraudulent concealment" in its opinion, the trial court clearly applied the doctrine in theory.

[2] *See also Amodeo v. Ryan Homes, Inc.*, 595 A.2d 1232, 1236-37 (Pa. Super. 1991) (concluding that principles of estoppel prevent a party from raising a SOL defense where the party agrees to perform a repair, represents to the other party that the repair was performed, and the other party relied upon the representation); *Via Net v. TIG Insurance Co.*, 211 S.W.3d 310, 313 (Tex. 2006) ("Due diligence may include asking a contract partner for information needed to verify contractual performance. If a contracting party responds to such a request with false information, accrual may be delayed for fraudulent concealment.").

at 476-77; *Gustine Uniontown Associates, Ltd. v. Anthony Crane Rental, Inc.*, 892 A.2d 830, 835 n.2 (Pa. Super. 2006). Since this matter can be disposed based solely upon the doctrine of fraudulent concealment, I believe that the Majority should refrain from addressing and deciding the broader issue of whether the discovery rule should apply to breach of contract claims in the context of this particular case where a misrepresentation is present. I find that such judicial restraint is absolutely imperative considering the body of case law from our Supreme Court, which, at the very least, strongly suggests that, as a matter of statutory construction, the discovery rule is implied or read into the term "accrued" in section 5502(a) of the Judicial Code, 42 Pa.C.S. §5502(a), and applies to each and every SOL listed in subchapter B of Chapter 55 of the Judicial Code, 42 Pa.C.S. §§5521-38, necessarily including the SOL in section 5525(8) for contract actions based on an express written agreement, 42 Pa.C.S. §5525(8).[3] *See Pastierik v. Duquesne Light Co.*, 526 A.2d 323, 325 (Pa. 1987) (holding that "application of the discovery rule" occurs when there are "[s]tatutory references to . . . the accrual of a 'cause of action'" because these claims "are subject to judicial interpretation as to the degree of knowledge a plaintiff must possess before the statute will start to run"); *see also Wilson v. El Daief*, 964 A.2d 354, 363 (Pa. 2009) ("[T]he discovery rule . . . is now appropriately regarded as an application of statutory construction arising out of the interpretation of the concept of the 'accrual' of causes of action. *See* 42 Pa.C.S. §5502(a)."); *Fine*, 870 A.2d at 857-58

---

[3] Section 5502 contains the heading, "Method of computing periods of limitation generally," and states in relevant part: "The time within which a matter must be commenced *under this chapter* shall be computed . . . from the time *the cause of action accrued . . . .*" 42 Pa.C.S. §5502(a) (emphasis added). Undoubtedly, the four-year limitation period in section 5525 of the Judicial Code for actions sounding in contract is part of Chapter 55.

(reiterating that section 5502(a) provides "that limitations periods are computed from the time the cause of action accrued" and emphasizing that even if a cause of action "has accrued and the prescribed statutory period has run," the discovery rule is an "exception[] that act[s] to toll the running of a statute of limitations," and that "the salient point giving rise to its application is the inability of the injured, despite the exercise of reasonable diligence, to know that he is injured and by what cause"); *Crouse v. Cyclops Industries*, 745 A.2d 606 (Pa. 2000) (concluding that a count for promissory estoppel, although technically a "quasi-contract" claim, was governed by the four-year SOL in section 5525(4) for breach of contract claims and, more importantly, was subjected to the discovery rule).

Moreover, following the above precedent from our Supreme Court, the Superior Court has concluded definitively that "[t]he discovery rule in Pennsylvania applies to all causes of action, including breach of contract." *Morgan v. Petroleum Products Equipment Co.*, 92 A.3d 823, 828 (Pa. Super. 2014); *see, e.g.*, *Levenson v. Souser*, 557 A.2d 1081, 1086-87 (Pa. Super. 1989) (en banc) (concluding that where the cause of action "does not fix a definite event as the beginning of the limitations period" and is instead subjected to section 5502(a) and the concept of "accrual" enunciated therein, the discovery rule applies "because the accrual of the cause of action is not fixed as one definitively established event and the existence of the cause of action may not be reasonably ascertainable within the limitations period"). Likewise, in cases concerning alleged breaches of express oral and written contracts, federal district courts have held that "Pennsylvania recognizes a discovery rule in breach of contract cases." *Creghan v. Procura Management, Inc.*, 91 F. Supp. 3d 631, 649 (E.D. Pa. 2015); *accord Slamon v. Carrizo (Marcellus) LLC* (M.D. Pa., No. 3:16-CV-2187, filed

September 5, 2017) (unreported), 2017 U.S. Dist. LEXIS 143242, at *31. Ultimately, this case law, although not binding, should provide this Court with additional cause for concern, prompting hesitation and reluctance to decide an issue that need not be decided and "to tread lightly in our examination." *In re Tribune Media Co.*, 799 F.3d 272, 276 (3d Cir. 2015).

The Majority says that "[o]ur Supreme Court, however, has not pronounced the applicability of the discovery rule to a breach of contract action based on an express written contract negotiated at arms' length." Slip op. at 24. However, the Majority has not cited one case where a court has concluded that the discovery rule *does not* apply to any of the causes of action in subchapter B of Chapter 55 of the Judicial Code. Absent such authority, and in light of the Pennsylvania case law discussed above, I cannot find persuasive value in the foreign jurisdictions that the Majority relies upon to reach its conclusion and must consider these cases to be of little to no value because they appear to be inconsistent with the law of our state.

Rather, on balance, I find that the foreign jurisdictions that have concluded that the discovery rule applies in breach of contract actions represents a more considered and reasoned judgment on the issue—one that is in harmony with Pennsylvania Supreme Court precedent and the spirit of Pennsylvania law. Under this approach, the discovery rule would apply to an alleged breach of a written contract "in situations where the breach is 'inherently undiscoverable,' 'inherently unknowable,' or 'difficult to detect,'" *Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tennessee, Inc.*, 566 S.W.3d 671, 711-12 & n.43 (Tenn. 2019), but would not apply in cases where the plaintiff fails to exercise due diligence, specifically "cases where the plaintiff's injury is open and obvious."

*Gust, Rosenfeld & Henderson v. Prudential Insurance Co. of America*, 898 P.2d 964, 967 (Ariz. 1995). Indeed, our Supreme Court has stressed that "[t]he salient point giving rise to the equitable application of the exception of the discovery rule is the inability, despite the exercise of diligence by the plaintiff, to know of the injury," *Pocono International Raceway, Inc., v. Pocono Produce Inc.*, 468 A.2d 468, 471 (Pa. 1983), and "[t]he rationale behind the discovery rule is that it is unjust to deprive a plaintiff of a cause of action before the plaintiff has a reasonable basis for believing that a claim exists." *Gust,* 898 P.2d at 967. In my view, the underlying reasons supporting the discovery rule are not diminished in any way based upon the status of a suit being labeled a contract claim, for the discovery rule "relates more to the circumstances under which a legal duty is breached and less to the nature of the cause of action." *Id.* As the Arizona Supreme Court explained:

> In fact, we find little to distinguish tort and contract such that the discovery rule should properly apply to one but not to the other. The difference between tort and contract liability has become an increasingly difficult distinction to make. But insofar as tort and contract are distinguishable, [the defendant's] arguments do not persuade us. We have said that the statute of limitations serves to protect defendants and courts from stale claims where plaintiffs have slept on their rights. However whether a tort victim or contract claimant, a blamelessly uninformed plaintiff cannot be said to have slept on his rights. Furthermore, the problems associated with stale litigation (e.g., failing memory, unavailable witnesses) are no more acute in contract claims than they are in tort. And in either case, the requirement that parties exercise reasonable diligence safeguards against cases where a plaintiff has truly allowed his claim to become stale. We also reject the suggestion that application of the discovery rule to contract cases would eviscerate the statute of limitations in commercial disputes. The

PAM – 7

> discovery rule has applied uniformly in tort cases for some time, and we do not believe that the statute of limitations has ceased to serve its purpose in tort cases.

*Id.* at 968-69 (internal citations and quotation marks omitted).

Therefore, I believe that the Majority lacks sufficient justification to create a special exception for written contracts—an exception that, apparently for the first time in the history of Pennsylvania law, exempts application of the discovery rule from a cause of action listed in subchapter B of Chapter 55 of the Judicial Code. In the end, though, I would decline to reach the issue of whether the discovery rule applies to actions founded upon an express written contract and would conclude that, under the doctrine of fraudulent concealment, the Authority's claim is not barred by the SOL.

Hence, I respectfully dissent.

_____
PATRICIA A. McCULLOUGH, Judge